DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for Sound Vision Care, Inc.*
120 Bloomingdale Road
White Plains, New York 10605
Robert L. Rattet
(914) 381-7400
rlr@dhclegal.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

In re:                                                    Chapter 11 Case

SOUND VISION CARE, INC., *et. al.*,                       Case No.: 25-72421 (LAS)
                                                          (Jointly Administered)

      Debtors.[1]
------------------------------------------------------------------x        Adv. Proc. No. 25-

SOUND VISION CARE, INC.,

      Plaintiffs.

                   -against-

KAPITUS LLC, KAPITUS SERVICING INC., AS AUTHORIZED
SUB-SERVICING AGENT OF KAPITUS LLC, ADVANCE
SERVICE GROUP, LLC D/B/A INADVANCE WORKING
CAPITAL, CAPITALDOMAIN LLC D/B/A CAPITAL DOMAIN,
PANTHERS CAPITAL LLC D/B/A PANTHERS CAPITAL, ATLAS
ACQUISITIONS LLC ON BEHALF OF SPEEDY CAPITAL, VEX
CAPITAL, QUICK FUNDING GROUP, WHITE ROAD CAPITAL,
LLC D/B/A  GFE HOLDINGS, EBF HOLDINGS DBA EVEREST
BUSINESS FUNDING, CFG MERCHANT SOLUTIONS, LLC,
MEGED FUNDING GROUP CORP. a/k/a MERGED FUNDING,
LENDBUG, LLC, PURE ADVANCE, SQUARE FUNDING LLC
d/b/a SQUARE ADVANCE, PARKVIEW ADVANCE U.S. EAGLE
FEDERAL CREDIT UNION, BANK OF AMERICA, N.A.,
FLUSHING BANK,  and U.S. SMALL BUSINESS
ADMINISTRATION,

      Defendants.

------------------------------------------------------------------x

---

[1]    The Debtors and the last four digits of the Debtors' federal tax identification number are: (i) Sound Vision Care, Inc. (0693), (ii) SVC of Coram, LLC (7727), (iii) SVC of East Setauket, LLC (4510), (iv) SVC of Riverhead, LLC (9996), (v) SVC of Southold, LLC (4232), (vi) SVC of Fresh Meadows, LLC (), (x) SVC of Manhasset, LLC (4333). The Debtors' mailing address is 1224 Ostrander Avenue, Riverhead, NY.

1

**VERIFIED COMPLAINT TO DETERMINE THE NATURE, EXTENT, VALIDITY, AND PRIORITY OF SECURITY INTERESTS AND DISALLOWANCE CLAIM NOS. 14 (KAPITUS), CLAIM NO. 27 (CAPITALDOMAIN), CLAIM NO. 16 (LENDBUG), CLAIM NO. 32 (SPEEDY CAPITAL, FILED BY ATLAS ACQUISITIONS LLC ON SPEEDY CAPITAL'S BEHALF), AND CLAIM NO. 4 IN THE CASE IN RE SVC OF RIVERHEAD, LLC, CASE NO. 25-72426[2] and OF ANY CLAIMS TO BE SUBSEQUENTLY FILED BY CERTAIN ENTITIES**

Sound Vision Care, Inc., SVC of Coram, LLC, SVC of East Setauket, LLC, SVC of Riverhead, LLC, SVC of Southold, LLC, SVC of Fresh Meadows, LLC, SVC of Manhasset, LLC (collectively, the "Plaintiffs" or "Debtors"), by their attorneys Davidoff Hutcher & Citron LLP, brings this adversary complaint (this "Complaint")[3] pursuant to Title 11 U.S.C. §§ 541 through 550 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"), 28 U.S.C. § 2201, and rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), against the Defendants : a) U.S. Eagle Federal Credit Union ("U.S. Eagle"), Bank Of America, N.A. ("BofA"), Flushing Bank ("Flushing") and United States Small Business Administration ("SBA") (collectively, the "Institutional Lenders"); b)   Kapitus LLC ("Kapitus"), Kapitus Servicing Inc., as Authorized Sub-Servicing Agent of Kapitus LLC ("Kapitus Servicing"), Advance Service Group, LLC ("Advance") d/b/a InAdvance Working Capital, Capitaldomain LLC d/b/a Capital Domain ("Capital Domain"),   Panthers Capital LLC d/b/a Panthers Capital ("Panthers"), Atlas Acquisitions LLC ("Atlas") on Behalf of Speedy Capital Speedy Capital ("Speedy"), Vex Capital ("Vex"), Quick Funding Group ("Quick Funding"), White Road Capital, LLC d/b/a  GFE Holdings ("GFE"), EBF Holdings d/b/a Everest Business Funding ("Everest"), CFG Merchant Solutions, LLC ("CFG"), Meged Funding Group Corp. d/b/a Meged a/k/a Merged

---

[2] For all claims besides Everest, the claim number corresponds to the claim filed in Sound Vision Care, Inc. The objections to claims covers all substantially identical claims filed by said entities in the companion Chapter 11 cases.

[3]    This Complaint is filed as a verified complaint so that the Debtor may use it in support of various motions in this proceeding in the manner provided by Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"). *See* Fed. R. Civ. P. Rule 65(b).

Funding ("Meged"), Lendbug, LLC ("Lendbug"), Pure Advance ("Pure"), Square Funding LLC d/b/a Square Advance ("Square"), and Parkview Advance ("Parkview") (collectively, the "MCA Lenders") (the "Institutional Lenders" and the "MCA Lenders" collectively, where appropriate, the "Defendants"), and respectfully alleges as follows:

## JURISDICTION AND VENUE

1.      On June 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned cases (the "Chapter 11 Cases").

2.      The Debtors' Chapter 11 cases (the "Chapter 11 Cases") have been administratively although not substantive consolidated [ECF Docket No. 104].

3.      This Adversary Proceeding is brought under and in connection with the Chapter 11 Cases that are now pending before the United States Bankruptcy Court for the Eastern District of New York (the "Court").

4.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to: (a) 28 U.S.C. § 157(b)(2)(K) to determine the nature, extent, validity, and priority of certain security interests and liens; (b) 28 U.S.C. § 157(b)(2)(H) to determine, avoid and recover fraudulent conveyances and obtain declaratory relief relating to conveyance of obligations; (c) 28 U.S.C. § 157(b)(2)(F) to determine, avoid and recover preferences; (d) 28 U.S.C. § 157(b)(2)(B) allowance or disallowance of claims against the Debtors' Estates (the "Estates") or estimation of claims for purposes of Plan confirmation; (e) 28 U.S.C. § 157(b)(2)(C) regarding counterclaims against persons filing claims against the Estates; (e) 28 U.S.C. § 157(b)(2)(A) regarding matters concerning the administration of the Estates; and (f) 28

---

[4] All ECF Docket references, unless otherwise stated,

3

U.S.C. § 157(b)(2)(O) other proceedings concerning the liquidation of the assets of the Estates or the adjustment of the debtor-creditor relationship.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## NATURE OF THE ACTION

6.      This is an action against a) the Institutional Lenders, solely to determine their secured status; b) MCA Lenders filing proofs of claim Kapitus, Kapitus Servicing, Advance, Capital Domain,  Panthers, Everest, Lendbug, and Atlas on behalf of Speedy ("MCA Claims Filers"); and c) Vex, Quick Funding, GFE, EBF, CFG, Meged, Pure, and Square,  and Parkview ("MCA Non-Claims Filers") (MCA Claims Filers and MCA Non-Claims Filers collectively, where appropriate ("MCA Parties") for: (a) declaratory relief; (b) to determine the nature, extent, validity, and priority of the various parties' interests in assets of the Debtors and interests in the Estates and property of the Estates; (c) to avoid preferences and fraudulent conveyances under sections 544, 547, and 548 of the Bankruptcy Code and to recover transfers avoided under section 550 of the Bankruptcy Code; and (d) to determine the allowability of claims filed by Defendants, both as filed or as may be filed.

## THE PARTIES

### A.  THE PLAINTIFFS

7.      The Plaintiffs are the Debtors in these Chapter 11 Cases. Each of the Debtors is a limited liability company organized and existing under the laws of the State of New York.

8.      The Debtors' headquarters are located at 1224 Ostrander Avenue, Riverhead, New York 11901. The Debtors operate seven retail eyeglass stores and are engaged in the operation of an eye-glass businesses.

B.  **INSTITUTIONAL LENDING PARTIES**

9.    U.S. Eagle is a federal credit union located at 3939 Osuna Ne, Albuquerque, New Mexico 87109. On October 29, 2025. U.S. Eagle has filed the following claims ("U.S. Eagle Claims") in these Chapter 11 cases:

a)  Sound Vision Care, Inc., Case No. 25-72421; Claim No. 30 in the amount of $4,982,200.23

b)  SVC of Coram,  LLC, Case No. 25-72422; Claim No. 5 in the amount of $4,982,200.23

c)  SVC of East Setauket,  LLC, Case No. 25-72423; Claim No. 4 in the amount of $4,982,200.23

d)  SVC of Fresh Meadow,  LLC, Case No. 25-72424; Claim No. 3 in the amount of $4,982,200.23

e)  SVC of Manhasset,  LLC, Case No. 25-72425; Claim No. 2 in the amount of $4,982,200.23

f)  SVC of Riverhead,  LLC, Case No. 25-72426; Claim No. 5  in the amount of $4,982,200.23 and

g)  SVC of Southold, LLC, Case No. 25-72428; Claim No. 5 in the amount of $4,982,200.23

10.    The SBA is a U.S. Government agency whose function is to provide total or partial guarantees of loans to businesses, and which provided to U.S. Eagle an unconditional guarantee of the loan by U.S. Eagle.

11.    The SBA also filed claims, on upon information and belief in connection with separate Economic Impact Disaster Loans ("EIDL") in these Chapter 11 cases:

a)  Sound Vision Care, Inc., Case No. 25-72421; Claim #12 filed by U.S. Small Business Administration, Amount claimed: $2,095,496.88

b)   SVC of Coram,  LLC, Case No. 25-72422; Claim #1 filed by U.S. Small Business Administration, Amount claimed: $277,566.74

c)  SVC of East Setauket,  LLC, Case No. 25-72423; Claim No. filed by U.S. Small Business Administration, Amount claimed: $198,837.72

5

d) SVC of Riverhead,  LLC, Case No. 25-72426 filed by U.S. Small Business Administration, Amount claimed: $799,591.65

The above claims are collectively defined as the "SBA EIDL Claims."

12.     Flushing is a savings bank located at 220 RXR Plaza, Uniondale, New York 11556. Flushing filed Claim No. 13 on Sound Vision Care, Inc. (the "Flushing Claim").

13.     BofA is a federally chartered institution located at 110 Wacker Drive, IL4−110−10−04, Chicago, Illinois 60606. BofA filed Claim No. 20 on Sound Vision Care, Inc. (the "BofA Claim").

14.     Upon information and belief, each of the U.S. Eagle Claims, either by themselves or in combination the SBA EIDL Claims, Flushing Claim and the BofA Claim materially exceeds the value of property owned by each of the Debtor entities securing those claims.

15.     As set forth in the charts annexed hereto as Exhibit "1," the Debtors believe that the claims held collectively by the Institutional Lender exhaust the asset pool available for by the MCA Lenders, and that all other parties asserting interests in property of the estate are unsecured creditors. The charts demonstrate that, upon information and belief: a) U.S. Eagle holds a senior secured claim in the amount of $4,982,200.23 against all Debtors; b) the SBA under EIDL loans holds secured claim against Sound Vision Care, Inc. in the amount of $2,095,496.88, SVC of Coram in the amount of $277,566.74, SVC of Riverhead in the amount of $799,581.65, and SVC of East Setauket in the amount of $198,837.72; c) Flushing Bank holds a secured claim against claim against Sound Vision Care, Inc. in the 505,114.80; and d) BofA holds a secured claim against Sound Vision Care, Inc. in the amount of $317,698.62.

16.     Upon information and belief all other claims purportedly secured by assets of the Debtors are unsecured claims under 11 U.S.C. § 506(a)(1).

6

## C.  THE MCA PARTIES

### i.        MCA PARTIES FILING PROOFS OF CLAIM

17.       Defendant Kapitus is a limited liability company with an address of Kapitus LLC, 2500 Wilson Boulevard Suite 350, Arlington, VA 22201, and upon information and belief, is engaged in the businesses of making MCA loans to businesses. Kapitus, together with Kapitus Servicing, filed three claims on August 25, 2025 (the "Kapitus Claims"). Kapitus filed Claim No. 14 against Sound Vision Care, Inc. in the amount of $121,317.66, Claim No. 2 against SVC of Coram, LLC in the amount of $121,317.66, and Claim No. Claim No. 2 against SVC of Riverhead, LLC in the amount of $121,317.66,  (the "Kapitus Claims").

18.       Defendant Kapitus Servicing is a limited liability company with an address of Kapitus Servicing, Inc., 2500 Wilson Boulevard, Suite 350, Arlington, VA 22201, and upon information and belief, is engaged in the businesses of making MCA loans to businesses. Kapitus Servicing, and filed the Kapitus Claims on behalf of Kapitus.

19.       Defendant Capital Domain is a limited liability company with an address c/o Capitaldomain LLC, 749 Gateway, Suite G-601, Abilene, Texas 79602. Capitaldomain Llc filed Claim No. 27 on October 1, 2025 against Sound Vision Care, Inc. in the amount of $114,600.00, with a "principal amount" of $79,665.64 (the "Capitaldomain Claim"), as a three-part claim as follows:

      e)  Part 1 – on behalf of Panthers (Amount $375,000 purchased amount, $149,851 purchase payment to Debtors);

      f)  Part 2 – On behalf of Capitaldomain LLC d/b/a Capital Domain ("Capital Domain") (Amount $270,000 purchased amount $ 190,000 purchase payment to Debtors); and

      g)  Part 3 – On behalf of Advance Service Group LLC ("Advance") d/b/a Inadvance Working Capital (Amount $47,950 purchased amount, $35,000 purchase payment to Debtors)

20.    Defendant Advance is a limited liability company with an address c/o Capitaldomain LLC, 749 Gateway, Suite G-601, Abilene, Texas 79602. Capitaldomain LLC filed Claim No. 27 on behalf of Advance on October 21, 2025.

21.    Defendant Panthers is upon information and belief a limited liability company with an address c/o Capitaldomain LLC, 749 Gateway, Suite G-601, Abilene, Texas 79602. Capitaldomain LLC filed Claim No. 27 on behalf of Panthers on October 21, 2025.

22.    Defendant Everest is upon information and belief a limited liability company with an address of 1202 Avenue U Ste 1115 Brooklyn NY 11229. EBF filed Claim No. 4 (the "Everest Claim") in the case of SVC of Riverhead, LLC on October 23, 2025.

23.    Defendant Lendbug, on September 3, 2025 filed the following claims (collectively, the "Lendbug Claims":

    a) Sound Vision Care, Inc., Case No. 25-72421; Claim No. 16 filed by LEND BUG, LLC in the amount of $59,606.91

    b) SVC of Coram, LLC, Case No. 25-72422; Claim No. 3 filed by LEND BUG, LLC in the amount of $59,606.91

    c) SVC of East Setauket, LLC, Case No. 25-72423; Claim No. 2 filed by LEND BUG, LLC in the amount of $59,606.91

    d) SVC of Fresh Meadow, LLC, Case No. 25-72424; Claim No. 2 filed by LEND BUG, LLC in the amount of $59,606.91

    e) SVC of Manhasset, LLC, Case No. 25-72425; Claim No. 1 filed by LEND BUG, LLC in the amount of $59,606.91

    f) SVC of Riverhead, LLC, Case No. 25-72426; Claim No. 3 filed by LEND BUG, LLC in the amount of $59,606.91 and

    g) SVC of Southold, LLC, Case No. 25-72428; Claim No. 3 filed by LEND BUG, LLC in the amount of $59,606.91.

24.    Defendant Speedy is, upon information and belief, a limited liability company with addresses, in the alternative, of: a) 300 N Main St, Spring Valley, NY 10977, Attn: Mordechai

8

Yitzchakov, Owner; and b) 243 Tresser Blvd., Suite 18, Stamford, CT 06901 Attn: Mordechai Yitzchakov, Owner. The Debtors entered into two MCA Agreements with Speedy dated August 29, 2024 and October 8, 2024. Upon information and belief, Atlas Acquisitions LLC has filed Claim No. 32 in the Sound Vision Care, Inc. case on behalf of Speedy.

25.    Defendant CFG is, upon information and belief, a limited liability company with an address of 180 Maiden Lane, 15th Floor, New York, NY 10038. CFG filed Claim No. 17 (the "CFG Claim")filed Claim No. 17 on September 3, 2025 in Sound Vision Care, Inc.,Case No. 25-72421.

**ii.        MCA Parties not filing Proofs of Claim**

26.    Defendant Vex is, upon information and belief, a limited liability company with an address of Vex Capital, 700 Canal Street 1st Floor, Stamford, CT 06902 Attn: Chanan Fuzailov, Owner. The Debtors entered into two MCA Agreements with Vex both dated November 19, 2024.

27.    Defendant Quick Funding is, upon information and belief, a limited liability company with an address of Quick Funding, 157 Church Street Suite 1971, New Haven, CT 06510 Attn: Sam Shrem. The Debtors entered into two MCA Agreements with Quick Funding respectively dated February 17, 2023 and December 11, 2024.

28.    Defendant GFE is, upon information and belief, a limited liability company with an  address of White Road Capital, LLC d/b/a GFE Holdings Attn: Attn: Boris Musheyev, CEO, 27-01 Queens Plaza N., #802 Long Island City NY 11101. The Debtors entered into an MCA Agreement dated January 19, 2023.

29.    Defendant Meged is, upon information and belief, a limited liability company with an address of Meged Funding, 1 Princeton Avenue, Brick, NJ 08724 Attn: Moshe Ludmir, Authorized Representative. The Debtors entered into an MCA Agreement with Meged dated August 24, 2023.

30.     Defendant Pure is, upon information and belief, a limited liability company with an address of Pure Advance, 1 Princeton Avenue, Brick, NJ 08724 Attn: Moshe Ludmir, Authorized Representative. The Debtors entered into one MCA Agreement with Pure dated October 1, 2024.

31.     Defendant Square is upon information and belief a limited liability company with an address of Square Advance, 90 E Halsey Rd., Parsippany, NJ 07054, Attn: Elliot Siegel, Chief Executive Officer. The Debtors entered into two MCA Agreements dated respectively December 20, 2022 and December 22, 2022.

32.     Defendant Parkview is, upon information and belief, a limited liability company with an address of Parkview Advance, 400 Main Street, Stamford, CT 06901, Attn: Matthew Walsh and/or 600 Summer St Suite 204, Stamford, CT 06901, Attn: Matthew Walsh. The Debtors entered into two MCA Agreements with Parkview respectively dated December 1, 2022 and December 11, 2024.

## DEBTORS' TRANSACTIONS AMONG AND WITH INSTITUTIONAL LENDERS AND MCA LENDERS

### A. DEBTORS' TRANSACTIONS WITH THE INSTITUTIONAL LENDERS

33.     Prior to the Petition Date, the Debtors entered into Loan Agreements with the Institutional Lenders.

### 1) THE U.S. EAGLE CLAIMS

34.     All of the U.S. Eagle Claims as defined above are, upon information and belief, identical claims, secured by appropriate UCC filings and accompanying security agreements (the "Security Agreements"). The Security Agreements, all of which are substantially identical, provided a lien, both to U.S. Eagle and the SBA as follows:

> 2. The Collateral in which this interest is granted is all of Debtor's assets, described below in reference to which an "X" or "W" has been placed in the box applicable thereto, howsoever arising, wherever located and whether now owned or existing or

hereafter existing or acquired, including, but not limited to, the following (collectively, the "Collateral"):

(i) all Equipment;

(ii) Omitted

(iii) all Accounts Receivable;

(iv) all Inventory;

(v) any and all monies, reserves, deposits, deposit accounts, securities, cash, cash equivalents, balances, credits, and interest and dividends on any of the above, of or in the name of Debtor, now or hereafter with the Secured Party or any financial institution, and any and all other property of any kind and description of or in the name of Debtor, now or hereafter, for any reason or purpose whatsoever, in the possession or control of, or in transit to, the Secured Party or any agent or bailee for the Secured Party;

(vi) all chattel paper, whether tangible or electronic chattel paper, contract rights, letter of credit rights, and instruments including, without limitation, all supporting obligations of any of the foregoing;

(vii) all General Intangibles;

(viii) all investment property;

(ix) all furniture and fixtures; Case 8-25-72421-las Claim 30 Filed 10/29/25 Desc Main Document

(x) all documents of title and receipts, whether negotiable or non-negotiable, including all goods covered by such documents;

(xi) all books, records and computer records in any way relating to the above property;

(xii)  any and all substitutions, renewals, improvements, replacements, additions and proceeds of (i) through (xi) above, including, without limitation, proceeds of insurance policies.

35.     The SBA guaranteed the U.S. Eagle loans but pursuant to 11 U.S.C. § 509(b) has not filed a claim for its contingent guarantee liability.

36.     U.S. Eagle's treatment as a secured creditor was ratified by the Court under the Second Interim Order Authorizing Use of Cash Collateral by Debtors Pursuant to 11 U.S.C. § 363 dated August 27, 2025 ("Second Interim Cash Collateral Order," ECF Docket No. 99), and the Third Interim Order Authorizing Use of Cash Collateral by Debtors Pursuant to 11 U.S.C. § 363 dated October 21, 2025 ("Third Interim Cash Collateral Order," ECF Docket No. 154).

## 2)    THE SBA EIDL CLAIMS

37.     As set forth above, the SBA filed the SBA EIDL Claims.

11

38.    The SBA's treatment as a secured creditor was ratified by the Court under the Debtors' Interim Order Authorizing Use of Cash Collateral by Debtors Pursuant to 11 U.S.C. § 363 dated July 24, 2025 ("First Interim Cash Collateral Order," ECF Docket No. 63, the Second Interim Cash Collateral Order, and the Third Interim Cash Collateral Order Interim Order.

### 3)  THE FLUSHING CLAIM

39.    As set forth above, Flushing filed the Flushing Claim.

40.    Flushing's treatment as a secured creditor was ratified by the Court under the Debtors' Second Interim Cash Collateral Order, and Third Interim Cash Collateral Order Interim Order.

### 4)  THE BofA CLAIM

41.    As set forth above, BofA filed the BofA Claim.

42.    BofA's treatment as a secured creditor was ratified by the Court under the Debtors' First Interim Cash Collateral Order, the Second Interim Cash Collateral Order, and the Third Interim Cash Collateral Order Interim Order.

### ALLEGATIONS RELATING TO INSTITUTIONAL LENDERS

43.    The Institutional Lenders are named as parties for the sole purposes of determining the nature, extent, validity, and priority of their rights against the Debtors since they are senior to the remaining parties and the amount of their claims is believed to materially exceed the value of the collateral securing those claims.

44.    The Debtors seek a determination as to the value of the collateral held by each of the Institutional Lenders for the purposes of determining appropriate treatment pursuant to sections 506(a)(1) and 1129(b)(2(A) of the Bankruptcy Code.

## COMMON FACTUAL ALLEGATIONS RELATING TO MCA DEFENDANTS

45.    All of the MCA Defendants hold solely unsecured claims within the meaning of 506(a)(1) and 1129(b)(2(A).

46.    In addition to the Institutional Lenders, the Debtors sought alternative forms of financing from the MCA Lenders. The MCA Lenders and the Debtors entered into the MCA Agreements (defined below). The terms of the agreements were part of similar but not identical standard-form contracts prepared by the MCA Lenders. Upon information and belief, the terms of the MCA Agreements are unduly oppressive, unconscionable, and/or are against public policy. As a result of the unequal bargaining power and oppressive terms, the MCA Agreements between the Debtors and the MCA Lenders are contracts of adhesion.

47.    The Debtors assert that the MCA Agreements are characterized by fraud in their inception because of the usually explicit assurance that the Debtors' payments would adjust or reconcile down as well as up with the Debtors' cash flow and, despite high costs, would never cripple the Debtors. The provisions, common to all MCA Agreements, were known as "Reconciliation Provisions," Adjustment Provisions" or similar nomenclature.

48.    Among other functions, a significant purpose of the Reconciliation or other provisions was to enable the MCA Lenders to assert that their advances or loans were of an indefinite length or maturity, a significant factor in determining whether the advances were loans or genuine sale/repurchase provisions.

49.    The Reconciliation Provisions frequently though not always require that the Debtors not be in default at the time of a request for an adjustment of payments, a virtually impossible condition for an entity forced to resort to high-cost financing.

50.    The assurances that the Debtors' payments were readily and easily adjustable to meet cash flow were false inasmuch as the MCA Lenders knew or should have known that the

Reconciliation Provisions were rarely if ever exercised, provides vague relief that is difficult to quantify and indeed as a practical matter were difficult to exercise.

51.     Additionally, the provisions stating that bankruptcy was not necessarily a default were virtually meaningless in light of stringent guarantee provisions for non-debtor entities.

52.     The MCA Agreements each include security agreements purporting to secure the loans against the Debtors.

53.     The MCA Agreements are loans by their terms. Despite the MCA Agreements' form as "sales" or "purchases" of receivables, the transactions were, in economic substance, loans. The MCA Agreements are a common scheme created by the MCA Lenders to create and collect upon unlawful debts. To avoid state usury laws and regulations, the MCA Lenders refer to the MCA Agreements as a "purchase and sale" of the Debtors' future accounts, contracts, and other obligations arising from the payment of monies from the Debtors' customers.

54.     In addition to the MCA loans demanding usurious interest rates, the Debtors were required to pay additional interest under the MCA Agreements in the form of processing fees and other expenses.

55.     The MCA Agreements are each governed by New York law with exception of: a) Kapitus, governed by Virginia law, b) Panthers, Speedy and Lendbug, governed by Connecticut law; and c) as otherwise expressly stated.

56.     The effect of these MCA loans, together with others, was to allocate substantially all of the Debtors' business cash flow to the MCA Lenders.

### A.  The Predatory MCA Industry.

57.    The MCA industry was spawned from the 2008 Financial Crisis. Marketed as "alternative financing" the MCA industry in fact promoted high-interest loans disguised as sales of accounts, to disguise lending practices forbidden by state usury laws.

### B.  The MCA Agreements are Substantively and Procedurally Unconscionable.

58.    The MCA Agreements are contracts of adhesion that are not negotiated at arms'-length, and unconscionable within the meaning of NY UCC § 2-302.

59.    The MCA Agreements contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are actually loans.

60.    Among these one-sided terms, the MCA Agreements include all or most of the following provisions: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, moving, or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (4) a venue and choice-of-law provision requiring the merchant, in certain instances, to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (5) a personal guarantee, the revocation of which is an event of default, (6) a jury trial waiver, (7) a class action waiver, (8) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (9) a prohibition of obtaining financing from other sources, (10) the maintenance of business interruption insurance, (11) in certain instances, an assignment of lease of a merchant's premises lease in favor of the MCA company, (12) the right to direct all credit card processing payments to the MCA company, (13) a power-of-attorney to settle all obligations

15

due to the MCA Company, and (14) a power of attorney authorizing the MCA company to "file any claims or taken any action or institute any proceeding . . ."

61.      The MCA Agreements are also unconscionable within the meaning of NY UCC § 2-302 because they contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily or weekly payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily or weekly payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee or Underwriting Fee.

62.      The MCA Agreements are also unconscionable within the meaning of NY UCC § 2-302 because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default if the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of Merchant.

63.      The MCA Agreements also contain numerous burdensome penalties, including, without limitation: (i) requiring debtors pay for MCA attorneys' fees; (ii) accelerating the total debt upon an Event of Default as defined in the various agreements, and (iii) mandating merchants assign 100% their receivables after only one missed payment.

64.      Though the MCA Agreements purport to contain binding and mandatory reconciliation provisions to adjust payments to cash flows, said provisions are rarely useful to the merchant and unduly awkward.

16

65.     The weekly payments under the MCA Agreements described below were, upon information and belief, effectively fixed and absolute and the agreements' reconciliation provision was unworkable.

66.     Upon information and belief, the MCA Parties did not maintain reconciliation departments and did not have anyone trained or otherwise dedicated to performing any reconciliation of a merchant's accounts.

67.     Upon information and belief there exist few if any agreements between MCA Parties and account sellers under which the Reconciliation Agreements were effectuated.

**C.  The MCA Lenders Intentionally Disguise the True Nature of the Transactions.**

68.     Despite the documented form, the transactions are, in economic reality, loans that are repayable.

69.     The payments are fixed, and the so-called reconciliation provision are mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the Purchased Amount as defined in the various agreements is contemplated and effectively mandated to be repaid within a specified time.

70.     The default and remedy provisions purport to hold the merchants liable for repayment of the Purchased Amount. The loans seek to obligate the merchants to ensure sufficient funds are maintained in the Account to make the daily/weekly payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants are in default and, upon default, the outstanding balance of the Purchased Amount becomes immediately due and owing.

71.     While the MCA Agreements purport to "assign" all the merchant's future account receivables to the MCA Lenders until the Purchased Amount are paid, the merchants retain all the indicia and benefits of ownership of the account receivables including the right to collect, possess

17

and use the proceeds thereof. Indeed, rather than purchasing receivables, The MCA Lenders merely acquire a security interest in the merchant's accounts to secure payment of the Purchased Amount as defined in the various agreements.

72.    The MCA Lenders do not sample or investigate the quality of the receivables of which they are taking an assignment.

73.    The transactions are underwritten based upon an assessment of the merchant's credit worthiness, not the creditworthiness of any account debtor.

74.    The Purchased Amount is not calculated based upon the fair market value of the merchant's future receivables but rather is unilaterally dictated by the MCA Lenders based upon the compensation for the use of money that the MCA Lenders want to be paid. Indeed, as part of the underwriting process, the Defendants do not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value.

75.    The amount of the Payments is determined based upon when the MCA Lenders want to be paid, and not based upon any good faith estimate of the merchant's future account receivables.

76.    The MCA Lenders assume no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constitutes a default under the agreements.

77.    The MCA Lenders require that the merchants undertake certain affirmative obligations and make certain representations and warranties that are aimed at ensuring the company will continue to operate and generate receivables and a breach of such obligations, representations and warranties constitutes a default, which fully protects the MCA Lenders from any risk of loss resulting from the merchant's failure to generate and collect receivables.

18

78.    The MCA Lenders require that the merchant grant it a security interest in its receivables and other intangibles and in connection with same filed UCC security interests and liens.

79.    The MCA Lenders require further that the individual owners and other entities (the "Guarantors") guarantee the performance of the representations, warranties, and covenants, which the MCA Lenders knew or reasonably should have known would be breached from day one.

**INDIVIDUALIZED DECLARATORY AND DAMAGE CLAIMS AGAINST EACH MCA LENDER FILING CLAIMS AGAINST THE DEBTORS OR ANY OF THE DEBTORS**

**COUNT I**

**CLAIMS AGAINST KAPITUS AND KAPITUS SERVICING**

80.    Repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if set forth and repeated at length herein.

81.    The Debtors entered into a Forward Purchase Agreement (the "Kapitus – Riverhead Purchase Agreement #1") dated June 12, 2024 between Debtor SVC of Riverhead LLC and Kapitus and a Forward Purchase Agreement (the "Kapitus – Riverhead Purchase Agreement #2") dated September 18, 2024 between Debtor SVC of Riverhead LLC and Kapitus. (the Kapitus – Riverhead Purchase Agreement #1 and the Kapitus – Riverhead Purchase Agreement #2 collectively, where appropriate, the "Kapitus – Riverhead Agreements").

82.    On August 25, 2025 Kapitus filed the Kapitus Claim.

83.    This Adversary Proceeding serves as an objection to the Kapitus Claim under 11 U.S.C. § 502(a) and Fed.R.Bankr.P. Rule 3007(b).

## A.  JUNE 12, 2024 AGREEMENT

84.    By the Kapitus – Riverhead Purchase Agreement #1 between Debtor SVC of Riverhead LLC and Kapitus, Debtor SVC of Riverhead LLC sold to Kapitus 8.8% of its receivables as follows:

> h)  Purchased Amount: $154,800.00
>
> i)  Total dollar amount of Receipts to be delivered to Purchaser:
>
>     Purchase Price: $120,000.00
>
>     Gross total paid for Receipts purchased.
>
>     Closing Fee: $4,200.00 ((3.5%) of Purchase Price)
>
>     Up-front fee charged for closing the purchase.
>
>     Net Purchase Price: $95,807.00

85.    Fixed ACH Terms: Specified Amount and Frequency: $3,973.00 Weekly.

86.    The Kapitus – Riverhead Purchase Agreement #1 contains the following reconciliation provision:

> The Specified Amount shall be reconciled to reflect the Seller's actual Receipts at Seller's request. Seller may initiate a reconciliation by calling 1-800-780-7133 and requesting to speak with a Kapitus Servicing, Inc. ("Servicer") customer service representative. The Seller agrees to provide any information needed to complete such reconciliation, including providing online access to Seller's banking transaction data through a secure, read-only link. It is the Seller's responsibility to provide bank transaction data and/or statements for any and all bank accounts held by the Seller to reconcile the ACH debits to the Specified Percentage permitting Servicer to debit or credit the difference to the Seller. Upon verification of the Receipts generated by Seller, Servicer shall adjust the Specified Amount on a going-forward basis to more closely reflect the Seller's actual Receipts. Once the Seller elects to conduct a reconciliation, either Party may thereafter request a reconciliation once every 30 days. After each adjustment, the new dollar amount shall be deemed the Specified Amount until any subsequent adjustment.

87.    Notwithstanding the foregoing reconciliation provision, the Kapitus – Riverhead Purchase Agreement #1 stated, in bold letters: **"SELLER SHALL NOT BE ENTITLED TO**

**ANY RECONCILIATION IF SELLER HAS DEFAULTED UNDER ANY OF THE TRANSACTION DOCUMENTS."**

88. Upon information and belief, under almost any conceivable scenario the Debtor party to the Kapitus – Riverhead Purchase Agreement #2 would be in default of one or more provisions under said agreement under any conditions that it would seek reconciliation.

89. Upon information and belief, the Reconciliation Provision is almost unusable by the Debtors, and provides vague and indefinite relief without specifying a mandated formula. The Agreement stated that Kapitus would adjust the payments "to more closely reflect the Seller's actual Receipts" without providing any quantifiable formula.

90. Upon information and belief, upon default, the percentage of the accounts of the Debtors that were collectable by Kapitus increased to 100%.

91. Under provisions of the Kapitus – Riverhead Agreement the Kapitus received the guarantees and grants of security interests in the assets of Debtors Sound Vision Care, Inc., and SVC Of Coram LLC and non-debtors SVC of Murray Hill, LLC, SVC of Greenlawn, LLC.

92. The Kapitus – Riverhead Agreements were governed by the laws of the Commonwealth of Virginia.

93. The relevant usury laws materially vary between the Commonwealth of Virginia and the State of New York.

94. New York State has a paramount interest in the enforcement of its laws with regard to usury.

95. The bankruptcy system has a paramount interest in the enforcement of equitable principals with regard to usury under 11 U.S.C. § 558.

21

96.    The interests of New York State and the bankruptcy system would be more impaired if its policy were subordinated to the policy of the Commonwealth of Virginia.

97.    New York usury law should apply to determination of the Kapitus Claim.

**B.  SEPTEMBER 18, 2024 AGREEMENT**

98.    By the Kapitus – Riverhead Purchase Agreement #2 between Debtor SVC of Riverhead LLC and Kapitus, Debtor SVC of Riverhead LLC sold to Kapitus 2.6% of its receivables as follows:

    a)  Purchased Amount: $46,440.00

    b)  Total dollar amount of Receipts to be delivered to Purchaser:

        Purchase Price: $36,000.00

        Gross total paid for Receipts purchased.

        Closing Fee: $900.00 ((2.5%) of Purchase Price)

        Up-front fee charged for closing the purchase.

        Net Purchase Price: $35,100.00

    c)  Fixed ACH Terms: Specified Amount and Frequency: $1,192.00 Weekly.

99.    The Kapitus – Riverhead Purchase Agreement #2 contains the following reconciliation provision:

> The Specified Amount shall be reconciled to reflect the Seller's actual Receipts at Seller's request. Seller may initiate a reconciliation by calling 1-800-780-7133 and requesting to speak with a Kapitus Servicing, Inc. ("Servicer") customer service representative. The Seller agrees to provide any information needed to complete such reconciliation, including providing online access to Seller's banking transaction data through a secure, read-only link. It is the Seller's responsibility to provide bank transaction data and/or statements for any and all bank accounts held by the Seller to reconcile the ACH debits to the Specified Percentage permitting Servicer to debit or credit the difference to the Seller. Upon verification of the Receipts generated by Seller, Servicer shall adjust the Specified Amount on a going-forward basis to more closely reflect the Seller's actual Receipts. Once the Seller elects to conduct a reconciliation, either Party may thereafter request a reconciliation once every 30 days. After each adjustment, the new dollar amount shall be deemed the Specified Amount until any subsequent adjustment.

100.    Notwithstanding the foregoing reconciliation provision, the Kapitus – Riverhead Purchase Agreement #2 stated, in bold letters: **"SELLER SHALL NOT BE ENTITLED TO ANY RECONCILIATION IF SELLER HAS DEFAULTED UNDER ANY OF THE TRANSACTION DOCUMENTS."**

101.    Upon information and belief, under almost any conceivable scenario the Debtor party to the Kapitus – Riverhead Purchase Agreement #2 would be in default of one or more provisions under said agreement under any conditions that it would seek reconciliation.

102.    Upon information and belief, the Reconciliation Provision is almost unusable by the Debtors, and provides vague and indefinite relief without specifying a mandated formula. The Agreement stated that Kapitus would adjust the payments "to more closely reflect the Seller's actual Receipts" without providing any quantifiable formula.

103.    Upon information and belief, upon default, the percentage of the Accounts of the Debtors that were collectable by Kapitus increased to 100%.

104.    Under provisions of the Kapitus – Riverhead Agreement the Kapitus received the guarantees and grants of security interests in the assets of Debtors Sound Vision Care, Inc., and SVC Of Coram LLC and non-debtors SVC of Murray Hill, LLC, and SVC of Greenlawn, LLC.

105.    The relevant usury laws materially vary between the Commonwealth of Virginia and the State of New York.

106.    New York State has a paramount interest in the enforcement of its laws with regard to usury.

107.    The bankruptcy system has a paramount interest in the enforcement of equitable principals with regard to usury under 11 U.S.C. § 558.

108.    The interests of New York State and the bankruptcy system would be more impaired if its policy were subordinated to the policy of the Commonwealth of Virginia.

109.    New York usury law should apply to determination of the Kapitus Claim.

**C. ALLEGATIONS COMMON TO KAPITUS AND KAPITUS SERVICING WITH RESPECT TO THE KAPITUS AGREEMENTS, AND RELIEF SOUGHT WITH RESPECT TO KAPITUS AND KAPITUS SERVICING**

110.    Kapitus Servicing is the servicing agent for Kapitus.

111.    This complaint seeks identical relief with respect to Kapitus and Kapitus Servicing.

112.    The Debtors made payments of $1,825.00 within ninety days of June 23, 2025, the date of the Chapter 11 filing to Kapitus and/or Kapitus Servicing (the "Kapitus Preference Payments").

113.    The Kapitus Preference Payments made for the benefit of Kapitus and/or Kapitus Servicing, and were made on account of an antecedent debt.

114.    The Kapitus Preference Payments allowed Kapitus and/or Kapitus Funding an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

115.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

116.    The effective interest rate for the Kapitus loans exceed 25%.

117.    Kapitus commenced an action entitled <u>Kapitus Servicing, Inc. v. Jeffrey S. Williams Jr.</u> in State of Virginia, Chesterfield County (the "<u>Virginia Action</u>").

118.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Kapitus and Kapitus Servicing the following relief:

    a)  Declaration that the laws of the State of New York apply to the Debtors' transactions with Kapitus and Kapitus Servicing;

    b)  Relief broadening the automatic stay so as to enjoin the Virginia Action;

c) Applying all payments made to Kapitus and/or Kapitus Servicing to have been made to the principal amounts advanced to the Debtors, defined in the Agreements as the Net Purchase Price;

d) Disallowing the Kapitus Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that the Kapitus Claim represents in whole or in part unmatured interest;

e) Declaring that the receipt of the CFG Preference Payments mandates the disallowance of the CFG Claim pursuant to 11 U.S.C. § 502(d); and

f) Reclassifying the Kapitus Claim as a general unsecured Claim.

## COUNT II

## CLAIMS AGAINST LENDBUG

119.    Repeats and realleges each and every allegation contained in Paragraphs 1 through 79 as if set forth and repeated at length herein.

120.    On September 3, 2025 Lendbug filed the Lendbug Claims in all of Plaintiffs' proceedings.

121.    This Adversary Proceeding serves as an objection to the Lendbug Claim under 11 U.S.C. § 502(a) and Fed.R.Bankr.P. Rule 3007(b).

### A.  FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

122.    By Future Receivables Sale And Purchase Agreement (the "Lendbug Agreement") dated November 8, 2024 between Sound Vision Care, Inc[5]. Debtor SVC of Riverhead LLC and Lendbug, the Debtors sold to Lendbug 45% of its receivables as follows:

a) Purchased Amount: $235,200.00

b) Total dollar amount of Receipts to be delivered to Purchaser:

Purchase Price: $160,000.00

Other charges and deductions: $10,000.00

---

[5] Sound Vision Care Inc. and all entities listed on the "Addendum to the Agreement," those being all or most debtor and non-debtor affiliates joined the Lendbug Agreement.

Net Funding Amount: $150,000.00

123.    The estimated amount of weekly payments to Lendbug was $11,760.00.

124.    The Lendbug Agreement, Article X, contains the following reconciliation provision:

RECONCILIATION.

a. Seller's Right for Reconciliation.

The Parties each acknowledge and agree that:

i. If at any time during the term of this Agreement Seller shall experience unforeseen decreases to their Daily Receipts, the Seller shall have the right, at its sole and absolute discretion, to request a modification to their Scheduled Remittance.

ii. Such modification to their Scheduled Remittance (the "Reconciliation") shall be performed by the Purchaser within five (5) Business Days following the written request by Seller for said Reconciliation.

b. Reconciliation Procedure.

i. Seller shall submit a written request for Reconciliation via email to with the subject line, "REQUEST FOR RECONCILIATION"; info@lendbug.com

ii.  Said written request shall include a copy of the Seller's most recent bank statement and credit card processing statement;

iii. The Purchaser shall have five (5) Business Days to review the Request for Reconciliation.

125.    Upon information and belief, the above-referenced reconciliation provision is almost unusable for, among other reasons, it was not specific as to the method of calculation of the modified payment amount.

126.    Under provisions of the Lendbug Agreement Lendbug received the guarantees and grants of security interests in the assets of all or substantially all of the Debtors and non-debtor affiliated companies as well as Jeffrey Williams, the Debtors' principal.

127.    The Lendbug Agreement purports to be governed by the laws of the State of Connecticut.

128.    The relevant usury laws materially vary between the State of Connecticut and the State of New York.

129.    New York State has a paramount interest in the enforcement of its laws with regard to usury.

130.    The bankruptcy system has a paramount interest in the enforcement of equitable principals with regard to usury under 11 U.S.C. § 558.

131.    The interests of New York State and the bankruptcy system would be more impaired if its policy were subordinated to the policy of the State of Connecticut.

132.    New York usury law should apply to determination of the Lendbug Claim.

## B.  RELIEF SOUGHT WITH RESPECT TO LENDBUG

133.    On February 10, 2025 Debtor Sound Vision Care Inc. entered into a "Commercial Settlement Agreement" with Lendbug (the "Lendbug Settlement Agreement").

134.    The Debtors made payments of $16,500.00 within ninety days of June 23, 2025, the date of the Chapter 11 filing to Lendbug (the "Lendbug Preference Payments").

135.    The Lendbug Preference Payments made for the benefit of Lendbug and were made on account of an antecedent debt.

136.    The Lendbug Preference Payments allowed Lendbug an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

137.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

138.    The effective interest rate for Lendbug loan exceed 25%.

139.    On November 12, 2025 Lendbug commenced an action entitled <u>Lend Bug LLC v. SVC of Port Jefferson Station LLC and other non-debtor entities, and Jeffrey Slaney Williams Jr.</u> in State of New York, Kings County, Index No. 539856/2025 (the "<u>Lendbug State Court Action</u>").

140.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Lendbug the following relief:

   a)  Declaration that the laws of the State of New York apply to the Debtors' transactions with Lendbug;

   b)  Relief broadening the automatic stay so as to enjoin Lendbug from prosecuting the Lendbug State Court Action or otherwise seeking any collections from non-debtor parties;

   c)  Applying all payments made to Lendbug to have been made to the principal amounts advanced to the Debtors, defined in the Agreements as the Net Funding Amount;

   d)  Disallowing Lendbug Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that Lendbug Claim represents in whole or in part unmatured interest;

   e)  Avoiding the Lendbug Preference Payments under 11 U.S.C. § 547(a) and recovering the Lendbug Preference Payments for the benefit of the Debtors' Estates pursuant to 11 U.S.C. § 550;

   f)  Vacating the Lendbug Settlement Agreement; and

   g)  Reclassifying the Lendbug Claim as a general unsecured Claim.

## COUNT III

### CLAIMS AGAINST CAPITALDOMAIN LLC

141.    Repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if set forth and repeated at length herein.

142.    On October 21, 2025 Capitaldomain LLC filed Claim #27 in the total amount of (the "Capitaldomain Claim") consisting of three parts, each with an attached MCA Agreement:

   a)  Part 1 –  Panther Capital, February 23, 2024 (the "Panthers Claim");

    b) Part 2 – Capital Domain, April 23, 2024 (the "Capital Domain Claim"); and

    c) Part 3 - Advance Service Group LLC, March 22, 2024 (the "Advance Service Group Claim")

143. This Adversary Proceeding serves as an objection to the Capitaldomain Claim under 11 U.S.C. § 502(a) and Fed.R.Bankr.P. Rule 3007(b).

144. In Part I, Subparagraph 7 of the Capitaldomain Claim an amount of $114,600.00 is stated and apparently applies to all three parts of the Capitaldomain Claim.

145. It is unknown whether Capitaldomain is connected to the operative nucleus of facts concerning the Panthers Claim, the Capitaldomain Claim and/or the Advance Service Group Claim.

## A. THE PANTHERS CLAIM

146. On February 23, 2024 Sound Vision Care, Inc. entered into a Secured Purchase Agreement with Panthers. By the Panthers Agreement between Debtor Sound Vision Care, Inc. and Panthers, Debtor Sound Vision Care, Inc. and other affiliated entities sold to Panthers 40% of its receivables as follows:

    a) Purchased Amount: $375,000.00;

    b) Total dollar amount of Receipts to be delivered to Purchaser:

     Purchase Price: $250,000.00

     Gross total paid for Receipts purchased.

     Net Purchase Price: $ 148,851.00 (after other charges)

147. Remittance Amount: $16,305.00 Weekly.

148. The Panthers Secured Purchase Agreement contains the following reconciliation provision, denominated an Adjustment Provision:

**Adjustments to the Remittance.** If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant

29

may give notice to PC to request a decrease in the Remittance. The amount shall be decreased if the amount received by PC was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide PC with viewing access to their bank account as well as all information reasonably requested by PC to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

149.    Notwithstanding the foregoing reconciliation provision, this right of reconciliation is expressly subject to the Panthers Agreement not being in default.

150.    Upon information and belief, the Adjustment Provision is almost unusable by the Debtors, and provides vague and indefinite recitation that payments "shall be modified to more closely reflect the Merchant's actual receipts" without specifying a mandated formula.

151.    Upon information and belief, under almost any conceivable scenario the debtor party to the Panthers Agreement would be in default of one or more provisions under said agreement under any conditions that it would seek reconciliation.

152.    Upon information and belief, upon default, the percentage of the Accounts of the Debtors that were collectable by Panthers increased to 100%.

153.    Under provisions of the Panthers Agreement Panthers received the guarantees and grants of security interests in the assets of SVC of Fresh Meadows LLC, together with six non-Debtor entities.

154.    The Panthers Agreement is governed by the laws of the State of Connecticut.

155.    The relevant usury laws materially vary between the State of Connecticut and the State of New York.

156.    New York State has a paramount interest in the enforcement of its laws with regard to usury.

157.    The bankruptcy system has a paramount interest in the enforcement of equitable principals with regard to usury under 11 U.S.C. § 558.

158.    The interests of New York State and the bankruptcy system would be more impaired if its policy were subordinated to the policy of the State of Connecticut.

159.    New York usury law should apply to determination of the Panthers Claim.

160.    The Debtors made payments of $18,500.00 within ninety days of June 23, 2025, the date of the Chapter 11 filing to Panthers (the "Panthers Preference Payments").

161.    The Panthers Preference Payments made for the benefit of Panthers and were made on account of an antecedent debt.

162.    The Panthers Preference Payments allowed Panthers an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

163.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

164.    The effective interest rate for Panthers loan exceed 25%.

165.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Panthers the following relief:

      a)  Declaration that the laws of the State of New York apply to the Debtors' transactions with Panthers;

      b)  Relief broadening the automatic stay so as to enjoin any collection activity against non-debtor affiliates;

      c)  Applying all payments made to Panthers to have been made to the principal amounts advanced to the Debtors, defined in the Agreements as the Net Amount of $149,851.00;

      d)  Disallowing the Panthers Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that the Panthers Claim represents in whole or in part unmatured interest;

31

      e) Avoiding the Panthers Preference Payments under 11 U.S.C. § 547(a) and recovering the Panthers Preference Payments for the benefit of the Debtors' Estates pursuant to 11 U.S.C. § 550; and

      f) Reclassifying the Panthers Claim as a general unsecured Claim.

## B. CAPITAL DOMAIN CLAIM

166.    By the Standard Merchant Cash Advance Agreement between Debtor "Sound Vision Care and all Entities Listed on Exhibit B[6]," Debtor Sound Vision Care Inc. sold to Capital Domain 6% of its receivables as follows:

      a) Purchased Amount: $270,000.00;

      b) Purchase Price: $200,000.00;

      c) Net Funds Provided: $190,000; and

      d) Initial Estimated Payment: $10,384.62 Weekly.

167.    The Capital Domain Agreement, Paragraph 4 contains the following provision, entitled "Reconciliation" provision, (the "Capital Domain Reconciliation Provision"):

> Any Merchant may give written notice to CAPITAL DOMAIN requesting that CAPITAL DOMAIN conduct a reconciliation in order to ensure that the amount that CAPITAL DOMAIN has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to support@capitaldomain.com and such notice will be deemed to have been received if and when CAPITAL DOMAIN sends a reply e-mail (but not a read receipt). If such reconciliation determines that CAPITAL DOMAIN collected more than it was entitled to, then CAPITAL DOMAIN will credit to the Account all amounts to which CAPITAL DOMAIN was not entitled within seven days thereafter. If such reconciliation determines that CAPITAL DOMAIN collected less than it was entitled to, then CAPITAL DOMAIN will debit from the Account all additional amounts to which CAPITAL DOMAIN was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. CAPITAL DOMAIN will complete each such reconciliation within two business days after receipt of a written request for one

---

[6] Those entities being SVC of Coram, SVC of East Setauket, SVC of Manhasset and SVC of Fresh Meadows, LLC, and various non-Debtor entities

accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

168.    Upon information and belief, the Capital Domain Reconciliation Provision is almost impossible for the Debtors to utilize for, among other reasons, that the relief obtainable is indefinite, and retrospective only.

169.    Under provisions of the Capital Domain Agreement, Panthers received a guarantee from SVC of Fresh Meadows LLC, SVC of Coram LLC, SVC of East Setauket LLC, SVC of Manhasset LLC and six non-debtor entities.

170.    New York usury law applies to determination of the Capital Domain Claim.

171.    The Debtors made payments of $43,084.00 within ninety days of June 23, 2025, the date of the Chapter 11 filing to Capital Domain (the "Capital Domain Preference Payments").

172.    The Capital Domain Preference Payments made for the benefit of Capital Domain and were made on account of an antecedent debt.

173.    The Capital Domain Preference Payments allowed Capital Domain an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

174.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

175.    In addition, the Debtors made postpetition payments to Capital Domain in the amount of $7,188.00 that are avoidable under 11 U.S.C. § 549 (the "Voidable Postpetition Payments").

176.    The effective interest rate for Capital Domain loan exceed 25%.

177.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Capital Domain the following relief:

        a)    Declaration that the laws of the State of New York apply to the Debtors' transactions with Panthers;

b)  Relief broadening the automatic stay so as to enjoin any collection activity against non-debtor affiliates;

c)  Applying all payments made to Capital Domain to have been made to the principal amounts advanced to the Debtors, defined in the Agreements as the Net Amount of $149,851.00;

d)  Disallowing the Capital Domain Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that the Capital Domain Claim represents in whole or in part unmatured interest;

e)  Avoiding the Capital Domain Preference Payments under 11 U.S.C. § 547(a) and recovering the Capital Domain Preference Payments for the benefit of the Debtors' Estates pursuant to 11 U.S.C. § 550;

f)  Avoiding the Capital Domain Post-petition Payments under 11 U.S.C. § 549(a) and recovering the Capital Domain Post-petition for the benefit of the Debtors' Estates pursuant to 11 U.S.C. § 550; and

g)  Reclassifying the Capital Domain Claim as a general unsecured Claim

## C.  ADVANCE SERVICE GROUP CLAIM

178.    By the Future Receivables Sale and Purchase Agreement between Debtor "SVC Of Greenlawn LLC," non-debtor SVC of Greenlawn, guaranteed upon information and belief by various Debtors including Sound Vision Care Inc, SVC of Fresh Meadows, LLC, SVC of Southold, LLC, SVC of Coram, LLC, SVC of East Setauket, LLC, SVC of Riverhead, LLC, SVC of Manhasset and non-Debtor parties[7] sold to Advance Service Group 15% of its receivables under the agreement dated March 22, 2024 (the "Advance Service Group Agreement") as follows:

a)  Purchased Amount: $47,950.00;

b)  Purchase Price: $35,000.00; and

c)  Initial Estimated Payment: $1,141.67 Weekly.

179.    The Advance Service Group Agreement, Paragraphs 10 - 13 contains the following provision, (the "Advance Service Group Reconciliation Provision"):

---

[7] SVC of Mastic, SVC of The Hamptons, SVC of West Islip, SVC of Bensonhurst, LLC, SVC of Forest Hills, SVC of Murray Hill and Jeffrey Williams

10. Seller's Right for Reconciliation. Seller and PURCHASER each acknowledges and agrees that:

a. If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Daily Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by PURCHASER (each such calendar month, a "Reconciliation Month").

b. Such reconciliation (the "Reconciliation") of the Seller's Initial Daily Installment for a Reconciliation Month shall be performed by PURCHASER within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by PURCHASER from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

c. One or more Reconciliation procedures performed by PURCHASER may reduce or increase the effective Initial Daily Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which PURCHASER will be debiting the Approved Bank Account may get shortened or extended indefinitely.

11. Request for Reconciliation Procedure.

a. It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Daily Installments during any Reconciliation Month by sending a request for Reconciliation to PURCHASER.

b. Any such request for Reconciliation of the Seller's Initial Daily Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement and credit card processing statements for the Reconciliation Month at issue, and shall be received by PURCHASER via e line "REQUEST FOR RECONCILIATION," within five (5) Workdays after the last day of the Reconciliation Month at issue (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by PURCHASER).

c. PURCHASER's receipt of Seller's request for Reconciliation after the expiration of the five (5) Workday period following the last day of the Reconciliation Month for which such Reconciliation is requested nullifies and makes obsolete Seller's request for Reconciliation for that specific Reconciliation Month.

35

d. Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and PURCHASER shall comply with each such request, provided that:

i. Each such request is made in accordance with the terms of this Section 11; and

ii. If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by PURCHASER from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

e. Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with PURCHASER's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by PURCHASER in full, or (ii) modify the amount of the Initial Daily Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month(s) as the result of the Reconciliation.

12. Adjustment of the Initial Daily Installment. Seller and PURCHASER each acknowledge and agree that: a. If at any time during the term of this Agreement Seller experiences a steady decrease in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Daily Installment that Seller is obligated to deliver daily to PURCHASER in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Daily Installment (the "Adjusted Daily Installment") shall replace and supersede the amount of the Initial Daily Installment set forth in Section 1 above. b. The Adjustment of the Initial Daily Installment shall be performed by PURCHASER within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Daily Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation. c. One or more Adjustments performed by PURCHASER may substantially extend the term of this Agreement.

13. Request for Adjustment Procedure.

a. It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to PURCHASER.

b. A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of: (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account and credit card processing statements immediately preceding the date of PURCHASER's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to PURCHASER based upon which statements the amount of the Initial Daily Installment set forth in Section 1 above (or the then cur determined, and shall be received by PURCHASER by email line "REQUEST FOR ADJUSTMENT," within five (5) Workdays after the date that is the later of (i) the last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during which an Adjustment Request shall be received by PURCHASER).

c. PURCHASER's receipt of a Seller's Adjustment Request after the expiration of the above referenced five (5) Workday period nullifies and makes obsolete such Adjustment Request.

d. Seller shall have the right to request Adjustment of the Initial Daily Installment, or the Adjusted Daily Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and PURCHASER shall comply in good faith with such request, provided that: i. Each such request for Adjustment is made in accordance with the terms of this Section 13;and ii. A request for Adjustment shall not be made after the Expiration Date.

e. Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with PURCHASER's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by PURCHASER in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

180.    Upon information and belief, the Advance Service Group Reconciliation Provision is almost impossible for the Debtors to utilize for, among other reasons, that the relief obtainable is indefinite and effectively discretionary.

181.    New York usury law applies to determination of the Advance Service Group Claim.

182.    The Debtors made payments of $33,984.94 within ninety days of June 23, 2025, the date of the Chapter 11 filing to Advance Service Group (the "Advance Service Group Preference Payments").

183.    The Advance Service Group Preference Payments made for the benefit of Advance Service Group and were made on account of an antecedent debt.

184.    The Advance Service Group Preference Payments allowed Advance Service Group an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

185.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

186.    The effective interest rate for Capital Domain loan exceed 25%.

187.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Advance Service Group the following relief:

a)  Declaration that the laws of the State of New York apply to the Debtors' transactions with Advance Service Group;

b)  Relief broadening the automatic stay so as to enjoin any collection activity against non-debtor affiliates;

c)  Applying all payments made to Advance Service Group to have been made to the principal amounts advanced to the Debtors, defined in the Agreements as the Net Amount of $35,000.00;

d)  Disallowing the Capital Domain Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that Advance Service Group Claim represents in whole or in part unmatured interest; and

e)  Avoiding the Advance Service Group Preference Payments under 11 U.S.C. § 547(a) and recovering the Capital Domain Preference Payments for the benefit of the Debtors' Estates pursuant to 11 U.S.C. § 550.

## COUNT IV

### CLAIMS AGAINST CFG MERCHANT SOLUTIONS LLC

188.    Repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if set forth and repeated at length herein.

189.    This complaint seeks relief with respect to Claim No. 17 filed by CFG Merchant Solutions LLC ("CFG") in the Sound Vision Care, Inc. case on September 3, 2025 in the amount of $48,948.00 (the "CFG Claim").

190.    The Debtors entered into a Purchase Agreement (the "CFG Purchase Agreement") dated October 18, 2024 between Debtor Sound Vision Care, Inc. and SVC of Riverhead LLC and CFG (the "CFG Purchase Agreement") dated October 18, 2024 between Debtor SVC of Riverhead LLC and CFG") (the "CFG Purchase Agreement").

191.    This Adversary Proceeding serves as an objection to the CFG Claim under 11 U.S.C. § 502(a) and Fed.R.Bankr.P. Rule 3007(b).

192.    By the CFG Purchase Agreement between Debtor Sound Vision Care, Inc. and CFG, Debtor Sound Vision Care, Inc. sold to CFG 14.98% of its receivables as follows:

        a)  Amount sold: $97,930.00;

        b)  Purchase Price: $70,000.00;

        c)  Gross total paid for Receipts purchased.

193.    Fixed ACH Terms: Specified Amount and Frequency: $4,779.00 Weekly or $955.80 daily.

194.    The CFG Purchase Agreement in Paragraph 7 contains the following reconciliation provision:

Reconciliation and Adjusting the Daily Amount (IMPORTANT PROTECTION FOR SELLER): The initial Daily Amount is intended to represent the specified Purchased Percentage of Seller's Future Receipts. At any time, Seller or Buyer may request that

Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the specified Purchased Percentage.

a. How Seller may Request a Reconciliation. Seller may request a reconciliation by sending an email to reconciliation@cfgms.com.

b. How Buyer may Request a Reconciliation. Buyer may request a reconciliation in writing via regular mail or e-mail.

c. Adjusting the Daily Amount. Seller agrees to provide Buyer any information reasonably requested by Buyer to assist in this reconciliation, including but not limited to Seller's most recent full month's official Bank Account statement, along with a list of subsequent transactions from the end of that statement to-date in any format Buyer reasonably requests (the "Reconciliation Information"). Upon receipt of the Reconciliation Information, Buyer shall promptly (but no later than three (3) calendar days following Buyer's reasonable verification of Reconciliation Information), adjust the Daily Amount on an (sic) going-forward basis to more closely reflect the Seller's actual Future Receipts times the specific Purchased Percentage. After each adjustment made the pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment. If an adjustment results in an increate to the Daily Amount, Buyer will give Seller notice prior to any such adjustment.

d. Failure to Provide Reconciliation Information. If Seller requests a reconciliation and fails to provide the Reconciliation Information within seven (7) calendar days after Seller's reconciliation request, Buyer may consider Seller's reconciliation request withdrawn. If Buyer requests a reconciliation and Seller fails to provide the Reconciliation Information within seven (7) calendar days after the Buyer's reconciliation request, Buyer may adjust the Daily Amount to the amount specified in the Schedule of Purchased Receipts.

195.    Upon information and belief, the Reconciliation Provision is almost unusable by the Debtors and provides vague and indefinite relief without specifying a mandated formula stating that CFG shall "adjust the Daily Amount on an (sic) going-forward basis to more closely reflect the Seller's actual Future Receipts." This provision provides no quantification or formula as to the adjustment.

196.    Upon information and belief, upon default, the percentage of the Accounts of the Debtors that were collectable by CFG increased to 100%.

197.    Under provisions of the CFG Purchase Agreement CFG received the guarantees and grants of security interests in the assets of Debtors Sound Vision Care, Inc., and SVC Of Coram LLC and non-debtors SVC of Murray Hill, LLC, SVC of Greenlawn, LLC.

198.    The CFG Agreements is governed by the laws of the State of New York.

199.    New York usury law should apply to determination of the CFG Claim.

200.    The Debtors made payments of $1,750.00 within ninety days of June 23, 2025, the date of the Chapter 11 filing to CFG (the "CFG Preference Payments").

201.    The CFG Preference Payments made for the benefit of CFG, and were made on account of an antecedent debt.

202.    The CFG Preference Payments allowed Lendbug an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

203.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

204.    The effective interest rate for the CFG loans exceed 25%.

205.    On November 12, 2025 an unknown person or persons threatened, via text message, to withdraw $9,995.00 via ACH transfer, and did not specify whether the ACH transfer was to come from a debtor or non-debtor entity.

206.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to CFG the following relief:

> a) Declaration that the laws of the State of New York apply to the Debtors' transactions with CFG;
>
> b) Applying all payments made to CFG to have been made to the principal amounts advanced to the Debtors, defined in the Agreement as the Purchase Price;
>
> c) Restraining CFG from making any ACH transfer from any debtor or non-debtor account;

41

d) Disallowing the CFG Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that the CFG Claim represents in whole or in part unmatured interest;

e) Declaring that the receipt of the CFG Preference Payments mandates the disallowance of the CFG Claim pursuant to 11 U.S.C. § 502(d); and

f) Reclassifying the CFG Claim as a general unsecured Claim.

## COUNT V

## CLAIMS AGAINST EBF HOLDINGS, LLC d/b/a EVEREST BUSINESS FUNDING

207. Repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if set forth and repeated at length herein.

208. This complaint seeks relief with respect to Claim No. 4 filed by EBF Holdings dba Everest Business Funding ("Everest") in the SVC of Riverhead LLC case on October 23, 2025 in the amount of $57,769.27 (the "Everest Claim").

209. The Debtors entered into a Purchase Agreement dated October 17, 2024 between Debtor SVC of Riverhead LLC and Everest (the "Everest Purchase Agreement").

210. This Adversary Proceeding serves as an objection to the Everest Claim under 11 U.S.C. § 502(a) and Fed.R.Bankr.P. Rule 3007(b).

211. By the Everest Purchase Agreement the Debtors sold to Everest 8% of its receivables as follows:

a) Amount sold: $124,100.00;

b) Purchase Price: $83,260.00 (reduced to $55,956.55 by deductions and payments to others);

c) Gross total paid for Receipts purchased;

d) Estimated payment terms: Specified Amount and Frequency: $4,003.25 Weekly;

212. The Everest Purchase Agreement contains the following reconciliation provision:

42

Changes to the Weekly Payment. The Weekly Payment is intended to represent the Specified Percentage of Seller 's Weekly Future Receipts. O nce each calendar month, Seller or Purchaser may request a reconciliation to the Weekly Payment to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Any reconciliation  request by Seller must be: (1) in writing; (2) include a copy of Seller's bank statement for the most recent calendar month; and (3) be sent to Everest Business Funding by e-mail at: trueup@everestbusinessfunding.com. It is solely the Seller's responsibility to send a complete bank statement. Seller agrees to provide Purchaser any information requested by Purchaser to assist in this reconciliation. Within four business days of Purchaser 's reasonable verification of such information, Purchaser shall adjust the Weekly Payment on a going-forward basis. The adjusted Weekly Payment will be based on Seller's actual Future Receipts from the 30- day period immediately prior to the date of Seller's reconciliation request times the Specified Percentage. Following this adjustment, the Weekly Payment will be in the same amount until a subsequent adjustment.

213.     Upon information and belief, the Reconciliation Provision is almost unusable by the Debtors, and provides vague and indefinite relief without specifying a mandated formula as to the adjustment.

214.     Upon information and belief, upon default, the percentage of the Accounts of the Debtors that were collectable by Everest increased to 100%.

215.     Under provisions of the Everest Purchase Agreement Everest, upon information and belief, received the guarantees and grants of security interests in other related entities and Jeffrey Williams.

216.     The Everest Agreement is governed by the laws of the State of New York.

217.     New York usury law should apply to determination of the CFG Claim.

218.     In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to CFG the following relief:

        a) Declaration that the laws of the State of New York apply to the Debtors' transactions with CFG;

        b) Applying all payments made to Everest to have been made to the principal amounts advanced to the Debtors, defined in the Agreement as the Purchase Price;

43

    c)   Disallowing the Everest Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that the Everest Claim represents in whole or in part unmatured interest; and

    d)   Reclassifying the Everest Claim as a general unsecured Claim.

219.    By the Future Receivables Sale and Purchase Agreement between Debtor "SVC of Greenlawn LLC," non-debtor SVC of Greenlawn, guaranteed upon information and belief by various Debtors including Sound Vision Care Inc, SVC of Fresh Meadows, LLC, SVC of Southold, LLC, SVC of Coram, LLC, SVC of East Setauket, LLC, SVC of Riverhead, LLC, SVC of Manhasset and non-Debtor parties[8] sold to Advance Service Group 15% of its receivables under the agreement dated March 22, 2024 (the "Advance Service Group Agreement") as follows:

    a)   Purchased Amount: $47,950.00;

    b)   Purchase Price: $35,000.00; and

    c)   Initial Estimated Payment: $1,141.67 Weekly.

220.    The Everest Agreement, Paragraphs 10 - 13 contains the following provision, (the "Everest Reconciliation Provision"):

> 10. Seller's Right for Reconciliation. Seller and PURCHASER each acknowledges and agrees that:
>
> a. If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Daily Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by PURCHASER (each such calendar month, a "Reconciliation Month").
>
> b. Such reconciliation (the "Reconciliation") of the Seller's Initial Daily Installment for a Reconciliation Month shall be performed by PURCHASER within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by PURCHASER from the Approved Bank Account

---

[8] SVC of Mastic, SVC of The Hamptons, SVC of West Islip, SVC of Bensonhurst, LLC, SVC of Forest Hills, SVC of Murray Hill and Jeffrey Williams

during the Reconciliation Month at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

c. One or more Reconciliation procedures performed by PURCHASER may reduce or increase the effective Initial Daily Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which PURCHASER will be debiting the Approved Bank Account may get shortened or extended indefinitely.

11. Request for Reconciliation Procedure.

a. It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Daily Installments during any Reconciliation Month by sending a request for Reconciliation to PURCHASER.

b. Any such request for Reconciliation of the Seller's Initial Daily Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement and credit card processing statements for the Reconciliation Month at issue, and shall be received by PURCHASER via e line "REQUEST FOR RECONCILIATION," within five (5) Workdays after the last day of the Reconciliation Month at issue (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by PURCHASER).

c. PURCHASER's receipt of Seller's request for Reconciliation after the expiration of the five (5) Workday period following the last day of the Reconciliation Month for which such Reconciliation is requested nullifies and makes obsolete Seller's request for Reconciliation for that specific Reconciliation Month.

d. Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and PURCHASER shall comply with each such request, provided that:

i. Each such request is made in accordance with the terms of this Section 11; and

ii. If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by PURCHASER from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

e. Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with PURCHASER's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by PURCHASER in

45

full, or (ii) modify the amount of the Initial Daily Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month(s) as the result of the Reconciliation.

12. Adjustment of the Initial Daily Installment. Seller and PURCHASER each acknowledge and agree that: a. If at any time during the term of this Agreement Seller experiences a steady decrease in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Daily Installment that Seller is obligated to deliver daily to PURCHASER in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Daily Installment (the "Adjusted Daily Installment") shall replace and supersede the amount of the Initial Daily Installment set forth in Section 1 above. b. The Adjustment of the Initial Daily Installment shall be performed by PURCHASER within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Daily Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation. c. One or more Adjustments performed by PURCHASER may substantially extend the term of this Agreement.

13. Request for Adjustment Procedure.

a. It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to PURCHASER.

b. A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of: (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account and credit card processing statements immediately preceding the date of PURCHASER's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to PURCHASER based upon which statements the amount of the Initial Daily Installment set forth in Section 1 above (or the then cur determined, and shall be received by PURCHASER by email line "REQUEST FOR ADJUSTMENT," within five (5) Workdays after the date that is the later of (i) the last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during which an Adjustment Request shall be received by PURCHASER).

46

c. PURCHASER's receipt of a Seller's Adjustment Request after the expiration of the above referenced five (5) Workday period nullifies and makes obsolete such Adjustment Request.

d. Seller shall have the right to request Adjustment of the Initial Daily Installment, or the Adjusted Daily Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and PURCHASER shall comply in good faith with such request, provided that: i. Each such request for Adjustment is made in accordance with the terms of this Section 13;and ii. A request for Adjustment shall not be made after the Expiration Date.

e. Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with PURCHASER's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by PURCHASER in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

221.    Upon information and belief, the Reconciliation Provision is almost unusable by the Debtors, and provides vague and indefinite relief without specifying a mandated formula as to the adjustment.

222.    Upon information and belief, upon default, the percentage of the Accounts of the Debtors that were collectable by Everest increased to 100%.

223.    Under provisions of the Everest Purchase Agreement Everest, upon information and belief, received the guarantees and grants of security interests in other related entities and Jeffrey Williams.

224.    The Everest Agreement is governed by the laws of the State of New York.

225.    New York usury law should apply to determination of the Everest Claim.

226.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Everest the following relief:

      a)  Declaration that the laws of the State of New York apply to the Debtors' transactions with CFG;

b) Applying all payments made to Everest to have been made to the principal amounts advanced to the Debtors, defined in the Agreement as the Purchase Price;

c) Disallowing the Everest Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that the Everest Claim represents in whole or in part unmatured interest; and

d) Reclassifying the Everest Claim as a general unsecured Claim.

## COUNT VII

## CLAIMS AGAINST ATLAS ACQUISITIONS CORP. ON BEHALF OF SPEEDY FUNDING LLC

227. Repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if set forth and repeated at length herein.

228. On October 30, 2025 Atlas filed Claim #32 on behalf of Speedy (the "Speedy Claim") in the amount of $248,035.00.

229. This Adversary Proceeding serves as an objection to the Speedy Claim under 11 U.S.C. § § 502(a) and Fed.R.Bankr.P. Rule 3007(b).

230. By the Speedy Funding Agreement dated October 8, 2024 between Debtor Sound Vision Care, Inc. and Speedy, guaranteed by Debtors SVC of Coram, LLC, SVC of East Setauket, LLC, SVC of Fresh Meadows, LLC, SVC of Riverhead, LLC, SVC of Southold, LLC, SVC of Riverhead, LLC, and numerous non-debtor parties as well as Jeffrey Slaney Williams sold to Speedy Advance Service Group 15% of its receivables under the agreement (the "Speedy Agreement") as follows:

a) Purchased Amount: $514,000.00;

b) Purchase Price: $350,000.00;

c) Net Amount: $100,000.00; and

d) Initial Periodic Amount: $25,725.00 Weekly.

48

231.    The Speedy Agreement contains the following provision, (the "Speedy Reconciliation Provision"):

X. RECONCILIATION.

a. Seller's Right for Reconciliation. The Parties each acknowledge and agree that:

i. If at any time during the term of this Agreement Seller shall experience unforeseen decreases to their Daily Receipts, the Seller shall have the right, at its sole and absolute discretion, to request a modification to their Scheduled Remittance.

ii. Such modification to their Scheduled Remittance (the "Reconciliation") shall be performed by the Purchaser within five (5) Business Days following the written request by Seller for said Reconciliation.

b. Reconciliation Procedure.

i. Seller shall submit a written request for Reconciliation via email to subs@speedyfundingllc.com with the subject line, "REQUEST FOR RECONCILIATION";

ii. Said written request shall include a copy of the Seller's most recent bank statement and credit card processing statement;

iii. The Purchaser shall have five (5) Business Days to review the Request for Reconciliation.

c. Warranties. The Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper. Nothing set forth in this Agreement shall be deemed to provide the Seller with the right to interfere with the Purchaser's right and ability to debit the Approved Bank Account while the request for Reconciliation is pending or until the Purchased Amount is collected by the Purchaser in full; or modify the amount of the Initial Daily Installment for any calendar month without prior approval of all Parties.

232.    Upon information and belief, the Speedy Reconciliation Provision is almost impossible for the Debtors to utilize for, among other reasons, that the relief obtainable is indefinite and effectively discretionary.

233.    The Speedy Agreement purports to be governed by the laws of the State of Connecticut.

234.    The relevant usury laws materially vary between the State of Connecticut and the State of New York.

235.    New York State has a paramount interest in the enforcement of its laws with regard to usury.

236.    The bankruptcy system has a paramount interest in the enforcement of equitable principals with regard to usury under 11 U.S.C. § 558.

237.    The interests of New York State and the bankruptcy system would be more impaired if its policy were subordinated to the policy of the State of Connecticut.

238.    New York usury law should apply to determination of the Speedy Claim.

239.    The Debtors made payments of $20,500.00 within ninety days of June 23, 2025, the date of the Chapter 11 filing to Speedy (the "Speedy Preference Payments").

240.    The Speedy Preference Payments made for the benefit of Speedy and were made on account of an antecedent debt.

241.    The Speedy Preference Payments allowed Speedy an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

242.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

243.    The effective interest rate for Speedy loan exceed 25%.

244.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Speedy the following relief:

     a) Declaration that the laws of the State of New York apply to the Debtors' transactions with Speedy;

     b) Relief broadening the automatic stay so as to enjoin Speedy from any collections from non-debtor parties;

     c) Applying all payments made to Speedy to have been made to the principal amounts advanced to the Debtors, defined in the Agreements as the Net Funding Amount;

d) Disallowing Speedy Claim under 11 U.S.C. § 502(b)(2) or reducing same on the basis that the Speedy Claim represents in whole or in part unmatured interest;

e) Avoiding the Speedy Preference Payments under 11 U.S.C. § 547(a) and recovering the Speedy Preference Payments for the benefit of the Debtors' Estates pursuant to 11 U.S.C. § 550; and

f) Reclassifying the Speedy Claim as a general unsecured Claim.

## COUNT VIII

## WITH RESPECT TO NON-CLAIM FILER VEX CAPITAL

245. Repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if set forth and repeated at length herein.

246. On November 19, 2024 Defendant Vex entered into two substantially similar MCA Agreements with Debtor Sound Vision Care, Inc. and affiliated companies: 1) Agreement No. 1 wherein Vex purported to "purchase" $315,000.00 in receivables for a net funding of $283,500 (Vex Agreement No. 1); and Agreement No. 1 wherein Vex purported to "purchase" $250,000.00 in receivables for a net funding of $200,000.00, with purchased price of $375,000.00 (Vex Agreement No. 2) (collectively, the "Vex Agreements").

247. The Vex Agreement contains the following provision, (the "Speedy Reconciliation Provision"):

X. RECONCILIATION.

a. Seller's Right for Reconciliation. The Parties each acknowledge and agree that:

i. If at any time during the term of this Agreement Seller shall experience unforeseen decreases to their Daily Receipts, the Seller shall have the right, at its sole and absolute discretion, to request a modification to their Scheduled Remittance.

ii. Such modification to their Scheduled Remittance (the "Reconciliation") shall be performed by the Purchaser within five (5) Business Days following the written request by Seller for said Reconciliation.

b. Reconciliation Procedure.

i. Seller shall submit a written request for Reconciliation via email to underwriting@sb.capital with the subject line, "REQUEST FOR RECONCILIATION";

ii. Said written request shall include a copy of the Seller's most recent bank statement and credit card processing statement;

iii. The Purchaser shall have five (5) Business Days to review the Request for Reconciliation.

c. Warranties. The Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper. Nothing set forth in this Agreement shall be deemed to provide the Seller with the right to interfere with the Purchaser's right and ability to debit the Approved Bank Account while the request for Reconciliation is pending or until the Purchased Amount is collected by the Purchaser in full; or modify the amount of the Initial Daily Installment for any calendar month without prior approval of all Parties.

248.    Upon information and belief, the reconciliation provisions under the Vex Agreements (the "Vex Reconciliation Provisions") are almost impossible for the Debtors to utilize for, among other reasons, that the relief obtainable is indefinite and effectively discretionary.

249.    The Vex Agreements purport to be governed by the laws of the State of Connecticut.

250.    The relevant usury laws materially vary between the State of Connecticut and the State of New York.

251.    New York State has a paramount interest in the enforcement of its laws with regard to usury.

252.    The bankruptcy system has a paramount interest in the enforcement of equitable principals with regard to usury under 11 U.S.C. § 558.

253.    The interests of New York State and the bankruptcy system would be more impaired if its policy were subordinated to the policy of the State of Connecticut.

254.    New York usury law should apply to determination of the Speedy Claim.

52

255.    The Debtors made payments of $21,000.00 within ninety days of June 23, 2025, the date of the Chapter 11 filing to Speedy (the "Vex Preference Payments").

256.    The Vex Preference Payments made for the benefit of Vex and were made on account of an antecedent debt or antecedent debts.

257.    The Vex Preference Payments allowed Vex an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

258.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

259.    The effective interest rate for Vex loans exceed 25%.

260.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Vex the following relief:

a)  Declaration that the laws of the State of New York apply to the Debtors' transactions with Speedy;

b)  Relief broadening the automatic stay so as to enjoin Vex from any collections from non-debtor parties;

c)  Applying all payments made to Vex to have been made to the principal amounts advanced to the Debtors, defined in the Agreements as the Net Funding Amount;

d)  Disallowing any claim that Vex may file, in addition to being a late claim, pursuant to 11 U.S.C. § 502(b)(2) or reducing same on the basis that Vex Claim represents in whole or in part unmatured interest;

e)  Avoiding the Vex Preference Payments under 11 U.S.C. § 547(a) and recovering the Speedy Preference Payments for the benefit of the Debtors' Estates pursuant to 11 U.S.C. § 550; and

f)  Classifying any claim Vex may file as a general unsecured Claim.

## COUNT IX

## WITH RESPECT TO NON-CLAIM FILER QUICK FUNDING

261.    Repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if set forth and repeated at length herein.

262.    On December 11, 2024 Defendant Quick Funding entered into two substantially similar MCA Agreements with Debtor Sound Vision Care, Inc. and affiliated companies wherein Quick Funding  purported to "purchase" $180,000.00 in receivables for a net funding of $120,000 (the "Quick Funding Agreement").

263.    The Quick Funding Agreement contains the following provisions (the "Quick Funding Reconciliation and Adjustment Provisions"):

X. RECONCILIATION.

10. Seller's Right of Reconciliation.
a. Seller and QFG each acknowledge and agree that: a. If at any time during the course of this Agreement Seller experiences a decrease or increase in its Weekly Receipts, Seller shall have the right to request retroactive reconciliation of the Weekly Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by QFG (each such calendar month, a "Reconciliation Month"). b. Such reconciliation (the "Reconciliation") of the Seller's Weekly Installment for a Reconciliation Month shall be performed by QFG within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by QFG from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue. c. One or more Reconciliation procedures performed by QFG may reduce or increase the effective Weekly Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which QFG will be debiting the Approved Bank Account may get shortened or extended indefinitely.
11. Request for Reconciliation Procedure.
a. Seller may initiate Reconciliation of Seller's actual Weekly Installments at any time by sending a request for Reconciliation to QFG.
b. Any such request for Reconciliation of the Seller's Weekly Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements, and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by QFG via email to accounting@quickfundingllc.com with the subject line "REQUEST FOR RECONCILIATION."
c. Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and QFG shall comply with each such request, provided that: i. Each such request is made in accordance with the terms of this Section 11; and ii. If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount

54

actually debited by QFG from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount. d. Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with QFG's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by QFG in full, or (ii) modify the amount of the Weekly Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

12. Adjustment of the Weekly Installment.

a. Seller and QFG each acknowledge and agree that: a. Seller and QFG shall have the right to request modification ("Adjustment") of the amount of the Weekly Installment on a going-forward basis to more closely reflect Seller's actual Weekly Receipts times the Specified Percentage. QFG will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated Weekly Installment until any subsequent Adjustment. If Seller requests an Adjustment, QFG shall perform the Adjustment within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Weekly Installment that shall be debited from the Approved Bank Account.

b. One or more Adjustments performed by QFG may substantially extend the term of this Agreement.

13. Request for Adjustment Procedure.

a. Seller and/or QFG may initiate an Adjustment by sending a request for Adjustment to the other party in writing. Seller may request an adjustment via e-mail to accounting@quickfundingllc.com with the subject line "REQUEST FOR ADJUSTMENT."

b. Within five (5) Workdays following a request for Adjustment (an "Adjustment Request") Seller shall provide to QFG's copies of: (i) Seller's most recent month's bank statement of the Approved Bank Account and month to- date transaction activity, credit card processing statements and any aging reports immediately preceding the date of QFG's receipt of the Adjustment Request.

c. Seller and QFG shall have the right to request Adjustment of the Weekly Installment as many times during the term of this Agreement as it deems proper, and QFG shall comply in good faith with such request, provided that: i. Each such request for Adjustment is made in accordance with the terms of this Section 13; and ii. A request for Adjustment shall not be made after the Expiration Date.

264.    Upon information and belief, the reconciliation provision under the Quick Funding

Agreement (the "Quick Funding Reconciliation Provisions") are almost impossible for the Debtors

to utilize for, among other reasons, that the relief obtainable is indefinite and effectively discretionary.

265.    The Quick Funding Agreement purports to be governed by the laws of the State of Connecticut.

266.    The relevant usury laws materially vary between the State of Connecticut and the State of New York.

267.    New York State has a paramount interest in the enforcement of its laws with regard to usury.

268.    The bankruptcy system has a paramount interest in the enforcement of equitable principals with regard to usury under 11 U.S.C. § 558.

269.    The interests of New York State and the bankruptcy system would be more impaired if its policy were subordinated to the policy of the State of Connecticut.

270.    New York usury law should apply to determination of the Quick Funding Claim.

271.    The Debtors made payments of $18,500.00 within ninety days of June 23, 2025, the date of the Chapter 11 filing to Speedy (the "Quick Funding Preference Payments").

272.    The Quick Funding Preference Payments made for the benefit of Quick Funding and were made on account of an antecedent debt or antecedent debts.

273.    The Quick Funding Preference Payments allowed Quick Funding an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

274.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

275.    The effective interest rate for Quick Funding loans exceed 25%.

276.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to Quick Funding the following relief:

a) Declaration that the laws of the State of New York apply to the Debtors' transactions with Quick Funding;

b) Relief broadening the automatic stay so as to enjoin Quick Funding from any collections from non-debtor parties;

c) Applying all payments made to Quick Funding to have been made to the principal amounts advanced to the Debtors, defined in the Agreements as the Net Funding Amount;

d) Disallowing any claim that Quick Funding may file, in addition to being a late claim, pursuant to 11 U.S.C. § 502(b)(2) or reducing same on the basis that Quick Funding Claim represents in whole or in part unmatured interest;

e) Avoiding the Quick Funding Preference Payments under 11 U.S.C. § 547(a) and recovering the Speedy Preference Payments for the benefit of the Debtors' Estates pursuant to 11 U.S.C. § 550; and

f) Classifying any claim Quick Funding may file as a general unsecured Claim.

## COUNT IX

## WITH RESPECT TO NON-CLAIM FILERS GFE, SQUARE. MEGED , AND PARKVIEW

277.    Repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if set forth and repeated at length herein.

278.    The Debtors have entered or may have entered into one or more MCA Agreements with the following entities:

a) White Road Capital, LLC dba GFE Holdings (the "GFE MCA Agreement");

b) Square Advance (the "Square MCA Agreements");

c) Pure Advance, LLC (the "Pure Advance Agreements");

d) Meged (the "Meged Agreement") and

e) Parkview (the "Parkview MCA Agreements);

57

279.    The GFE MCA Agreement, the Square MCA Agreements, the Pure Advance Agreements, the Meged Agreement and the Parkview MCA Agreements all contain provisions purporting to give the Debtors, as "Sellers" the right to reconcile the periodic repurchase obligations, in reality payments, to "more closely reflect" business volume, or similar words (the "Miscellaneous Reconciliation Provisions").

280.    The Miscellaneous Reconciliation Provisions are uniformly illusory.

281.    New York usury law should apply to determination of parties rights under the GFE MCA Agreement andthe Square MCA Agreements inasmuch as the Debtors' businesses are exclusively in New York and New York has a greater interest in enforcement of its policies.

282.    GFE, Square, Pure Advance, Meged and Parkview have or may have received payments in an amount lower than $7575 in the ninety days before the filing of the Chapter 11 petitions (the "Miscellaneous MCA Preference Payments").

283.    The Miscellaneous MCA Preference Payments made for the benefit of Quick Funding and were made on account of an antecedent debt or antecedent debts.

284.    The Miscellaneous MCA Preference Payments allowed their recipients to receive an amount greater than they would have received had the Debtors been liquidated in a case under Chapter 7.

285.    The Debtors were insolvent during the ninety day period prior to June 23, 2025.

286.    In addition to the relief sought against All MCA Lenders as described below, Plaintiffs seek, with regard to GFE MCA Agreement, and the Square MCA Agreements the following relief:

> a) Declaration that the laws of the State of New York apply to the Debtors' transactions;
>
> b) Relief broadening the automatic stay so as to enjoin GFE and Square from any collections from non-debtor parties;

c) Applying all payments made to GFE MCA Agreement, and the Square MCA Agreements to the principal amounts or funded amoungs advanced to the Debtors;  and

d) Disallowing any claim that GFE, Square, Pure Advance, Meged and Parkview may file, in addition to being a late claim, pursuant to 11 U.S.C. § 502(b)(2) or reducing same on the basis that said claims represent in whole or in part unmatured interest

## COUNT X

## (WITH REGARD TO ALL MCA LENDERS)

287.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

288.    Pursuant to NY GOL §5-511 and NY Penal Law §190.40, the Debtors seek judgment declaring all liabilities to the MCA Lenders to be void and the amounts claimed by said lenders to be forfeited.

## COUNT XI

## (WITH REGARD TO THE MCA LENDERS)
## DECLARATORY JUDGMENT – ADHESION CONTRACTS (28 U.S.C. § 2201)

289.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

290.    The Debtors seeks a declaratory judgment that the MCA Agreements that exist between the Debtors and the MCA Lenders are unconscionable within the meaning of NY UCC Section 2-302 and are contracts of adhesion. The contract terms unreasonably favored the drafter, were non-negotiable, and are unenforceable, resulting from fraud, undue influence, failure of consideration, and/or lack of meaningful consent.

291. Since the contracts are unenforceable as adhesion contracts, the provisions relating to arbitration, jury waiver, and other matters are unenforceable.

292. Pursuant to 28 U.S.C. § 2201, the Debtors seek declaratory judgment in which the Court conclusively rules to determine that the MCA Agreements are adhesion contracts and as such some or all of its provisions are unenforceable against the Debtors.

293. The Debtors seek a declaratory judgment from this Court that the MCA Agreements are contracts of adhesion and that the one-sided provisions favoring the MCA Lenders, including, without limitation, the choice-of-law, arbitration, jury waiver, and other provisions, are unenforceable against the Debtors.

294. The Debtors further seek a declaratory judgment from this Court that the obligations imposed by the MCA Agreements are void under New York and federal law.

## COUNT XII

### (WITH REGARD TO THE MCA LENDERS)
### DECLARATORY JUDGMENT -- CONTRACTS ARE LOAN TRANSACTIONS (28 U.S.C. § 2201)

295. The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

296. The Debtors seek a declaratory judgment that the agreements between the Debtors and the MCA Lenders, despite their form, are loan transactions. As such, they are subject to the laws applicable to and governing loans in the State of New York.

297. That evidence of such loans can be drawn from the following:

    a) In certain circumstances and upon information and belief, the Debtors were required to submit a credit application and do a credit check before entering the loan transactions.

    b) In certain circumstances and upon information and belief, the loans were underwritten by the MCA Lenders based on the assessment of the Debtors' creditworthiness.

c)  In certain circumstances and upon information and belief, the Debtors were required to execute a confession of judgment at the time of entering into some or all of the transactions.

d)  In certain circumstances and upon information and belief, the Debtors were required to obtain a personal guaranty.

e)  In certain circumstances and upon information and belief, the Debtors were required to authorize daily ACH withdrawals regardless of the amount and source of funds.

f)  In certain circumstances and upon information and belief, the MCA Lenders made no attempt to  collect receivables owed by the Debtors' customers.

g)  In certain circumstances and upon information and belief, the contracts specified no interest rate and that had the purpose and effect of concealing the unconscionable within the meaning of NY UCC Section 2-302 and usurious interest rate and fees.

h)  In certain circumstances and upon information and belief, the MCA Lenders obtained security agreements which is inconsistent with an acquisition of assets.

i)  In certain circumstances and upon information and belief, the MCA Lenders' accounting records treat the transaction as a loan showing principal and interest payments.

298.    Pursuant to 28 U.S.C. § 2201, the Debtors seek declaratory judgment in which the Court conclusively rules to affirm and determine that the MCA Agreements are loan transactions.

## COUNT XIII

### (WITH REGARD TO THE MCA LENDERS)
### DECLARATORY JUDGMENT -- CONTRACTS ARE LOAN TRANSACTIONS (28 U.S.C. § 2201)

299.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

300.    The Debtors seek a declaratory judgment from this court that the contracts between the MCA Lenders and the Debtors are in fact loan transactions, despite any reference to the contrary, and are "extension(s) of credit" within the meaning of New York law.

## COUNT XIV

### (WITH REGARD TO THE MCA LENDERS)
### DETERMINATION OF NATURE, EXTENT, VALIDITY AND PRIORITY OF
### SECURITY INTERESTS

301.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

302.    The MCA Lenders assert security interests in the Debtors' property upon, and in the event of default under, the MCA Agreements.

303.    Upon information and belief, all the accounts of the Debtors are assigned to the MCA Lenders.

304.    Upon information and belief, the gross margins of the Debtors' business are woefully insufficient to cover the charges of the MCA Lenders.

305.    Thus, the MCA Agreements are void or voidable on the basis of impossibility as well as unconscionability under UCC § 2-302.

306.    The collateral reserved under the MCA Agreements is, upon information and belief, of no value to any of the MCA Lenders.

307.    The Debtors request judgment of this Court determining the relative priorities of the Institutional Lenders and the MCA Lenders, and finding them to be, at best, unsecured creditors or alternatively determining their relative nature, extent, validity, and priority and their nature, extent, validity, and priority *vis a vis* the Lenders.

## COUNT XV

### (WITH REGARD TO THE MCA LENDERS - EQUITABLE SUBORDINATION –
### TITLE 11 U.S.C. § 510(c)

308.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

62

309.    The MCA Lenders' did not negotiate the MCA Agreements with the Debtors.  As a result, the MCA Agreements are not ethical or fair to the Debtors.

310.    The MCA Agreements are unconscionable within the meaning of UCC § 2-302.

311.    The Debtors received insufficient consideration for incurring the obligations set forth in the MCA Agreements.

312.    Based on the foregoing, the Debtors request that the Court equitably subordinate the Debtors' obligations to the MCA Lenders to all other unsecured creditors, and to the MCA Lenders.

313.    In addition to the equitable subordination of the MCA Lenders' claims, the Debtors request that any vote by the MCA Lenders on any plan of reorganization be designated as not made in good faith under  section 1126(e) of the Bankruptcy Code.

## COUNT XVI

### (WITH REGARD TO THE MCA LENDERS)
### DISALLOWANCE OF CLAIMS – TITLE 11 U.S.C. § 502(b)(2)

314.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

315.    The claims of the MCA Lenders constitute, in whole or in part, unmatured interest.

316.    Section 502(b)(2) of the Bankruptcy Code provides that to the extent a claim must be disallowed to the extent that same represents unmatured interest.

317.    The Debtors seek the disallowance of any claim filed by the MCA Lenders or otherwise asserted against the Estates.

## COUNT XVII

### (WITH REGARD TO THE MCA LENDERS)
### DISALLOWANCE OF CLAIMS - TITLE 11 U.S.C. § 502(d)

318.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

319.   Some or all of the MCA Lenders hold preferential and/or fraudulent transfers, that have not been returned to the Estates.

320.   Section 502(d) of the Bankruptcy Code provides that to the extent creditor retains preferential and/or fraudulent transfers, it does not hold a claim.

321.   The Debtors seek the disallowance of any claim filed by the MCA Lenders or otherwise asserted against the Estates.

## COUNT XVIII

### (WITH REGARD TO THE MCA LENDERS)
### DISALLOWANCE OF CLAIMS (TITLE 11 U.S.C. § 558)

322.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

323.   The obligations to the MCA Lenders are unenforceable under NY GOL §5-511 and Penal Law §190.40.

324.   Section 558 of the Bankruptcy Code provides the Estates with the benefit of any otherwise applicable defense.

325.   The Debtors seek the disallowance of any claim filed by the MCA Lenders or otherwise asserted against the Estates.

## COUNT XIX

### (WITH REGARD TO THE MCA LENDERS)
### EXTENSION OF THE AUTOMATIC STAY TO PROTECT GUARANTORS

326.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

327.    The inclusiveness of the list of Guarantors effectively prevents Guarantors from providing any financial assistance to the Debtors.

328.    The Guarantors' financial assistance is necessary to the Debtors' reorganization.

329.    The necessity of the Guarantors to defend multiple actions against non-debtors, including but not limited to Kapitus, Lendbug and CFG presents a material distraction to the principal of the Debtors' attention to his business and reorganization efforts.

330.    The enforcement of remedies against non-debtors subjects the Debtors to claims for indemnification and contribution.

331.    The Debtors request that the Court preliminarily and permanently enjoin the MCA Lenders from enforcing the MCA Agreements against any Guarantors pending further order of the Court.

## COUNT XX

### (WITH REGARD TO THE MCA LENDERS)
### EXTENSION OF THE AUTOMATIC STAY TO PROTECT GUARANTORS – TITLE 11 U.S.C. § 105

332.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

333.    Section 105 of the Bankruptcy Code allows the Court to enter any order necessary or proper to effectuate reorganization.

334.    Section 362(a)(1) (the "<u>Automatic Stay</u>") of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."

335.    The Automatic Stay disallows the MCA Lenders from continuing and/or commencing actions against the Debtors. Ultimately, the MCA Lenders seek to hold the Debtors responsible for the obligations of the MCA Agreements. To circumvent the Bankruptcy Code, the MCA Lenders may commence or continue case(s) against the Guarantors or enforce confession of judgments against said Guarantors and will have only one purpose: the ultimate liquidation and recovery of claims against the Debtors. And, because the MCA Lenders against the Debtors concern allege liabilities arising out of the Debtors' businesses prior to the Petition Date, such claims are expressly enjoined by the automatic stay.

336.    Likewise, the continuation and commencement of claims of the MCA Lenders are automatically stayed. Thus, the pursuit of these claims against the Guarantors is an effort to liquidate and recover claims against the Debtors.

337.    Additionally, the Automatic Stay enjoins actions against parties who share such an identity of interests with the Debtors in respect to those actions that the Debtors are, in effect, the real-party defendants.  Here, the Guarantors share such an identity of interests with the Debtors that the Debtors, in effect, would be the real-party defendants in the actions pressed by the MCA Lenders brought against Guarantors. Litigating, settling or attempting to establish the value of the claims against the Guarantors would liquidate claims against the Debtors, including by triggering existing indemnification and similar obligations of the Debtors to such entities.  Such litigation

also creates risks of binding the Debtors through res judicata and collateral estoppel and creating an evidentiary record that prejudices the Debtors.

338.    Moreover, all liability for the MCA Lenders' claims is subject to material dispute because the Debtors are the real-party defendants in any suit seeking to liquidate and recover on account of an MCA Lenders claim, the Automatic Stay stays such actions.

339.    The Automatic Stay also stays, among other actions, "the commencement or continuation . . . of a . . . proceeding against the debtor . . . to obtain possession of . . . or to exercise control over property of the estate." Bankruptcy Code Section 362(a)(3). This section of the Automatic Stay applies here in two ways.

340.    First, section 362(a)(3) bars the MCA Lenders from bringing or prosecuting actions against the Debtors or restricting their use of their inventory and accounts.

341.    Second, and in line with judicial authority and precedent with respect to the application of the Automatic Stay, the declaratory relief the Debtors seek in this Complaint and motions to be brought are necessary and appropriate to protect the integrity of the automatic stay and the bankruptcy proceeding.

342.    The Debtors request that the Court preliminarily and permanently enjoin the MCA Lenders from enforcing the MCA Agreements against any of the Guarantors pending further order of the Court.

**WHEREFORE,** Plaintiff respectfully requests the Court determine the nature, extent, priority, validity, and amount of all obligations to the MCA Lenders *vis a vis* the Institutional Lenders and award the Debtors with special damages, compensatory damages, punitive damages, and attorneys' fees as the Court may determine to be just and entering money judgment in an

amount to be determined by the Court, together with such other and further relief as this Court deems just and proper.

Respectfully submitted this 14th day of November, 2025.

**DAVIDOFF HUTCHER & CITRON LLP**

By: */s/ James B. Glucksman*
Robert L. Rattet
James B. Glucksman
John D. Molino

605 Third Avenue
New York, New York 10158
Telephone:   (914) 381-7400
Email:         rlr@dhclegal.com
                  jbg@dhclegal.com
                  jdm@dhclegal.com

*Counsel to the Debtor*
*and Debtor in Possession*

## UNSWORN DECLARATION AND VERIFICATION UNDER PENALTY OF PERJURY

Jeffrey S. Williams Jr. declares, under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Complaint is true and correct to the best of his knowledge, information and belief. This Complaint is a verified complaint within the meaning of Federal Rule 65(b)(1)(A).

November 14, 2025

_____
JEFFREY S. WILLIAMS JR.

69

EXHIBIT "1"

**Sound Vision Care Inc. 25-72421**

| Date of security agreement | Date of UCC filing | Secured Lender | Collateral | Amount per POC | Remarks |
|---|---|---|---|---|---|
| May 13, 2020 amended Dec. 5, 2021 | May 13, 2020 & February 24, 2025 | U.S. Small Business Administration | All tangible and intangible personal property,… | $2,095,496.88 | POC No. 12 (Due to government shutdown I am unable to obtain information from the SBA to confirm an earlier security agreement) |
| May 13, 2020 | May 20, 2020 | U.S. Eagle Federal Credit Union | The Collateral in which this interest is granted is all of Debtor's assets... | $4,982,200.23 | POC No. 30, SBA Guarantee |
| June 3, 2022 | June 3, 2022 | Flushing Bank | All personal property and fixtures in which the Debtor has or shall have an Interest, now or hereafter existing or acquired…. | $505,114.80 | POC No. 13 |
| May 23, 2013, Loan modification agreement Sept. 5, 2024 | Sept. 6, 2012 extended March 15, 2017 extended March 11, 2022 | Bank of America | To secure Debtor's indebtedness to Secured Party, Debtor grants Secured Party a continuing Security Interest in and to the following, now owned or hereafter acquired, and wherever located;(1) Accounts, including health care receivables…. | $ 317,698.62 | POC No. 20 |
| | | | | | |
| June 12, 2024 and September 18, 2024 | May 19, 2023 | Kapitus Servicing | Accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, chooses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to Debtor arising | $121,317.66 | POC No. 14 (MCA) |

| | | | | | |
|---|---|---|---|---|---|
| October 18, 2024 | | CFG Merchant Solutions LLC | | $48,948.00 | POC Claim No. 17 (MCA) NY Jurisdiction, not filed as secured claim |
| November 5, 2024 | Dec. 17, 2024 | Lendbug LLC | All assets now owned or hereafter acquired and wherever located, including…. | $59,606.91 | POC No. 16, (MCA) CT Jurisdiction |
| Part 1 – Panther Capital, February 23, 2024, CT Jurisdiction Part 2 - Capital Domain LLC, April 23, 2024, NY Jurisdiction Part 3 - Advance Service Group LLC, March 22, 2024, NY Jurisdiction | CC Not attached | CAPITALDOMAIN LLC | UCC Not attached | $114,600.00 | POC No. 27 (MCA) Part 1 – Panther Capital, February 23, 2024, CT Jurisdiction Part 2 - Capital Domain LLC, April 23, 2024, NY Jurisdiction Part 3 - Advance Service Group LLC, March 22, 2024, NY Jurisdiction |
| | | | | | |

**SVC of Coram, LLC 25-72422**

| Date of security agreement | Date of UCC filing | Secured Lender | Collateral | Amount | Remarks |
|---|---|---|---|---|---|
| November 12, 2021 | November 26, 2021 | U.S. Small Business Administration | All tangible and intangible personal property,… | $277,566.74 | POC No. 1 (Due to government shutdown I am unable to obtain information from the SBA to confirm an earlier security agreement) |
| March 1, 2021 | | U.S. Eagle Federal Credit Union | The Collateral in which this interest is granted is all of Debtor's assets... | $4,982,200.23 | POC No. 5, SBA Guarantee |
| June 12, 2024 and September 18, 2024 | May 19, 2023 | Kapitus Servicing | Accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, chooses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to Debtor arising | $121,317.66 | POC No. 1, VA Jurisdiction |
| November 5, 2024 | Dec. 17, 2024 | Lendbug LLC | All assets now owned or hereafter acquired and wherever located, including…. | $59,606.91 | POC No. 3, CT Jurisdiction |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**SVC of East Setauket, LLC 25-72423**

| Date of security agreement | Date of UCC filing | Secured Lender | Collateral | Amount | Remarks |
|---|---|---|---|---|---|
| November 19, 2021 | December 6, 2021 | U.S. Small Business Administration | All tangible and intangible personal property,… | $198,837.72 | POC No. 1 (Due to government shutdown I am unable to obtain information from the SBA to confirm an earlier security agreement) |
| March 1, 2021 | | U.S. Eagle Federal Credit Union | The Collateral in which this interest is granted is all of Debtor's assets... | $4,982,200.23 | POC No. 3, SBA Guarantee |
| November 5, 2024 | Dec. 17, 2024 | Lendbug LLC | All assets now owned or hereafter acquired and wherever located, including…. | $59,606.91 | POC No. 2, CT Jurisdiction |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**SVC of Fresh Meadows, LLC 25-72424**

| Date of security agreement | Date of UCC filing | Secured Lender | Collateral | Amount | Remarks |
|---|---|---|---|---|---|
| | | | | | |
| March 1, 2021 | | U.S. Eagle Federal Credit Union | The Collateral in which this interest is granted is all of Debtor's assets... | $4,982,200.23 | POC No. 3, SBA Guarantee |
| November 5, 2024 | Dec. 17, 2024 | Lendbug LLC | All assets now owned or hereafter acquired and wherever located, including…. | $59,606.91 | POC No. 2, CT Jurisdiction |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**SVC of Manhasset, LLC 25-72425**

| Date of security agreement | Date of UCC filing | Secured Lender | Collateral | Amount | Remarks |
|---|---|---|---|---|---|
| | | | | | |
| March 1, 2021 | | U.S. Eagle Federal Credit Union | The Collateral in which this interest is granted is all of Debtor's assets... | $4,982,200.23 | POC No. 2, SBA Guarantee |
| November 5, 2024 | Dec. 17, 2024 | Lendbug LLC | All assets now owned or hereafter acquired and wherever located, including…. | $59,606.91 | POC No. 1, CT Jurisdiction |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**SVC of Riverhead, LLC 25-72426**

| Date of security agreement | Date of UCC filing | Secured Lender | Collateral | Amount | Remarks |
|---|---|---|---|---|---|
| January 12, 2022 Amended | December 14,, 2021 | U.S. Small Business Administration | All tangible and intangible personal property,… | $799,591.65 | POC No. 1 (Due to government shutdown I am unable to obtain information from the SBA to confirm an earlier security agreement) |
| March 1, 2021 | | U.S. Eagle Federal Credit Union | The Collateral in which this interest is granted is all of Debtor's assets... | $4,982,200.23 | POC No. 5, SBA Guarantee |
| June 12, 2024 and September 18, 2024 | May 19, 2023 | Kapitus Servicing | Accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, chooses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to Debtor arising | $121,317.66 | POC No. 2, VA Jurisdiction |
| November 5, 2024 | Dec. 17, 2024 | Lendbug LLC | All assets now owned or hereafter acquired and wherever located, including…. | $59,606.91 | POC No. 3, CT Jurisdiction |
| October 17, 2024 | Jan. 14, 2025 | EBF holdings, LLC d/b/a Everest Business Funding | Secured Party has purchased certain "Future Receipts" from Debtor. "Future Receipts" means all payments made to Debtor by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card or other form of monetary payment in the ordinary course of Debtor's business | $57,769.27 | POC Claim No. 4, NY Jurisdiction |

**SVC of Southold, LLC 25-72428**

| Date of security agreement | Date of UCC filing | Secured Lender | Collateral | Amount | Remarks |
|---|---|---|---|---|---|
| | | | | | |
| March 1, 2021 | | U.S. Eagle Federal Credit Union | The Collateral in which this interest is granted is all of Debtor's assets... | $4,982,200.23 | POC No. 5, SBA Guarantee |
| | | | | | |
| November 5, 2024 | Dec. 17, 2024 | Lendbug LLC | All assets now owned or hereafter acquired and wherever located, including…. | $59,606.91 | POC No. 3, CT Jurisdiction |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |